**In re KOUNTRY KORNER STORE, Jack L. and Donna K. Schad, Danny Lane and Karen Sue Littlejohn, Debtors.**

**BANK ONE COLUMBUS, N.A., dba Visa, Plaintiff,**

**v.**

**Jack and Donna SCHAD, Defendants.**

**Bankruptcy Nos. 95–04050– R to 95–04052–R. Adversary No. 96–0114–R.**

United States Bankruptcy Court, N.D. Oklahoma.

May 21, 1998.

Gary G. Grisso, Tulsa, OK, for Debtors.

Theodore Gibson, Tips & Gibson, Tulsa, OK, for Plaintiff.

**MEMORANDUM OPINION**

DANA L. RASURE, Chief Judge.

On March 12, 1998, this matter came on for trial on the Complaint of Plaintiff Bank One Columbus, N.A., dba VISA (the "Bank"), for determination of whether a debt owed to the Bank by Defendants/Debtors Jack and Donna Schad (the "Schads") is dischargeable. The Bank contends that the debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or 523(a)(2)(C). The Bank appeared by and through its counsel, Theodore P. Gibson. The Schads appeared in person and through their counsel, Gary Grisso. Testimony was presented through witnesses Vicki McKibben and Donna Schad. After considering the testimony presented, the exhibits admitted, the pleadings filed in this adversary case, arguments of counsel, and the relevant legal authorities, the Court makes the following findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**Jurisdiction**

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I).

**Findings of Fact**

In August 1995, the Schads were solicited by the Bank to accept an AARP VISA card with a pre-approved credit line of $4,000 and an annual percentage rate of 8.5% for a certain promotional period. The Schads completed the "Approval Certificate" which requested the parties' signatures, dates of birth, social security numbers, telephone numbers and mother's maiden name ("for security purposes"). The Approval Certificate did not seek any financial information from the Schads nor did the Schads ever provide any financial information to the Bank. Upon returning the Approval Certificate to the Bank, the Schads received a VISA card with a credit line of $4,000 and an AARP Credit Card Services Account Cardholder Agreement (the "Agreement").

The Agreement is not designed to be signed by the cardholder. Among other terms and conditions, the Agreement provides that "You [a defined term, meaning 'the applicant or joint applicant ... or any person using the Account ... with the express or implied permission of any applicant'] promise to pay for all purchases and cash advances made by you or any authorized person.... In addition, you promise to pay all Finance Charges, and other fees and charges, in accordance with billing statements." Under the Agreement, the cardholder may pay the balance each month or may pay monthly installments of at least 2% of the balance. The Bank has the right to cancel the account at any time without prior notice, whether or not the account is in default, and the right to require the surrender of the card to the Bank or any bank or merchant acting upon the Bank's instructions. The Agreement also provides that "[i]f legal action is required by us [the Bank], you will pay the costs, including attorney's fees, if allowed by law." Notably, the Agreement does not contain a statement that use of the card will result in a representation by the cardholder that he or she has the present ability to pay the debt charged.

From August 1995 to December 22, 1995, only four transactions were made on the account. First, on October 25, 1995, the Bank charged the Schads an annual fee of $10.00, which was paid by the Schads on November 20, 1995. Then, on November 15, 1995, the Bank charged the Schads $12.00 for a one-year membership to a "Hotline" offered by the Bank and/or VISA. On the following statement dated November 27, 1995, the Bank suggested "This Holiday Season use your AARP Visa Classic credit card everywhere, everytime for just about anything." Thereafter, on December 1, 1995, Donna Schad obtained cash advances of $3,000 and $850 on the credit line by executing cash advance "charge slips" at Grand Federal Savings Bank and BOK–Grove, respectively.

On December 6, 1995, the Schads paid $1,000 to William D. Hunt, an attorney they retained to render bankruptcy advice.[1] The

---

1. According to the Schad's trial counsel, Mr. Hunt was disbarred in connection with the commission of bankruptcy crimes sometime during the pendency of these proceedings. The Schads' second bankruptcy counsel disappeared, abandoning the Schads and other clients, leaving dis-

Schads filed their voluntary petition under chapter 7 of the Bankruptcy Code on December 22, 1995. On December 27, 1995, the Bank posted a "late charge" of $10.00 to the account. With finance charges, the December 27, 1995 statement showed a balance due of $3,896.62.

At the time the Schads accepted the Bank's offer of credit, Ms. Schad and her brother and sister-in-law, Danny and Karen Littlejohn, had owned and, with one other employee, operated the Kountry Korner Store (the "Store") for approximately eleven years. Mr. Littlejohn was the acting manager of the Store. Beginning in the summer of 1995, the Store, the Schads and the Littlejohns experienced multiple hardships that set them back financially. Ms. Schad had hip surgery in June 1995. In the summer of 1995, a new convenience store opened directly across the street from the Store. In August 1995, the Store had eighty-two checks returned for insufficient funds. In November 1995, just as Ms. Schad had sufficiently recovered from surgery to allow her to return to work in the Store, Mr. Littlejohn suffered a heart attack and was hospitalized, leaving the day to day operation of the Store to Ms. Schad. With declining revenues resulting from the competition of the shiny new store across the street and increasing costs due to having to pay employees to perform work Ms. Schad and Mr. Littlejohn had traditionally performed, the partners borrowed money on their credit cards to cover operating and living expenses. Ms. Schad testified that she used the $3,000 cash advance to purchase a tanker of gasoline because it was a business necessity—Ms. Schad stated that "without gasoline, we didn't have a store." The evidence was not clear as to how the $850 advance was expended. Ms. Schad testified that she intended to repay the credit card debt when she and her brother "got back on their feet" and the "newness" of the competing convenience store wore off.

At the time of bankruptcy, the Schads had accrued approximately $64,000 in credit card debt on eighteen separate accounts. Many of the cards had balances at or near the credit limit. Statements for credit cards other than the Bank's card show that the Schads were making payments of $100 to $200 on many of the cards in the months of October and November 1995.

Ms. Vicki McKibben, a bankruptcy specialist employed by the Bank, testified regarding the procedure used by the Bank in determining to whom it offers credit. The Bank and AARP enjoy an arrangement wherein the Bank offers credit to AARP members who meet certain criteria set by the Bank; the AARP has limited input as to the credit terms offered to its members by the Bank. The Bank obtains all financial information it deems pertinent about the potential customer not from the customer but from third party credit reporting agencies. Significantly, no information regarding a potential customer's income, assets or financial condition is sought from the potential customer and no such information is considered by the Bank in making these credit decisions. Instead, the Bank relies upon historic information such as past delinquencies, number of credit inquiries made, outstanding balances on credit lines, amount of current installment payments, and past performance in credit transactions. A "score" is generated from this historical data, and the Bank sends offers to all potential customers who exceed a certain score. The Schads' "score," which the Schads had no part in generating, was the only evidence upon which the Bank based its decision to offer the Schads an unsolicited credit line of $4,000. As stated above, in order to accept the credit line, the Bank only required that the Schads mail back the "Acceptance Certificate" which contained only basic identification information.

At the time the Bank made its offer of credit to the Schads, the Store was in dire financial straits and Mr. Schad was earning a net monthly salary of approximately $1,700 and Ms. Schad was unemployed due to her medical condition. At that time, however, the Bank did not seek any information about the Store or Mr. or Ms. Schad's monthly income. Significantly, at the time the Schads filed their bankruptcy petition, the Store was

covery pending and the Schads' file in a state of disarray. Trial counsel entered an appearance at the pre-trial conference and has ably represented the Schads through trial.

*still* in dire financial straits and Mr. Schad was *still* earning a net salary of approximately $1,700. There was no significant change in the Schads' financial circumstances from the time the Bank approved the $4,000 line of credit to the time that the Schads drew on the line of credit, except that notwithstanding the borrowing, the Schads and the Little-johns were not successful in rescuing the Store from dissolution.

**Conclusions of Law**

■ A determination regarding the dischargeability of a debt must begin with the recognition that exceptions to discharge are narrowly construed and any doubts must be resolved in favor of permitting the debtor to discharge the debt. *See Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997).

**A. Objection to Discharge under Section 523(a)(2)(C).**

The Bank contends that the Schads' debt to the Bank is non-dischargeable pursuant to Section 523(a)(2)(A) and/or (C) of the Bankruptcy Code. Under Section 523(a)(2)(C), the proximity in time between a credit card charge or cash advance and the date of bankruptcy may afford a creditor that is owed credit card debt the benefit of a statutory presumption of fraud, and therefore non-dischargeability, in certain circumstances. Section 523(a)(2)(C) states, in pertinent part:

[F]or the purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief ..., are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor

or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act[.]

11 U.S.C. § 523(a)(2)(C).[2]

■ The presumption of non-dischargeability is rebuttable. Once a creditor establishes all elements of Section 523(a)(2)(C), the burden of proof shifts to debtor to disprove one element of fraud required by Section 523(a)(2)(A) (*i.e.,* intent, reliance, etc.) in order to avoid a judgment that the debt is non-dischargeable. *See Sears v. Hernandez (In re Hernandez)*, 208 B.R. 872, 882 (Bankr. W.D.Tex.1997).

■ Section 523(a)(2)(C) is invoked by the Bank because cash advances of $3,850 were drawn by the Schads only twenty-one days before the bankruptcy was filed. The first clause of Section 523(a)(2)(C) is not applicable here. There is no allegation, nor was there any evidence, that the Schads indulged in "luxury goods or services" within sixty days of their bankruptcy. The second clause of Section 523(a)(2)(C), applying specifically to cash advances, requires the creditor establish that: (1) cash advances aggregating more than $1,000; (2) were obtained within sixty days of the date of the bankruptcy petition; (3) by an individual debtor; (4) which were extensions of consumer credit under an open end credit plan. The first three elements were uncontested. Further, the extension of credit by virtue of a credit card is an "open end credit plan" under the Consumer Credit Protection Act (sometimes referred to as the "CCPA"). *See* 15 U.S.C. § 1601, *et seq.* The determinative issue under this section is whether the cash advances were extensions of *consumer credit,* as that term is defined by the CCPA.

The Consumer Credit Protection Act defines "consumer" by reference to the particular transaction at issue. Section 1602(h) of the CCPA states:

---

2. As of April 1, 1998, the aggregate amount of extensions of credit or cash advances by one creditor is $1,075, pursuant to the automatic cost of living adjustments to certain statutory mini-

mums and maximums established by 11 U.S.C. § 104. At the time of the cash advances at issue herein, the minimum aggregate amount of purchases was $1,000.

The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

15 U.S.C. § 1602(h). Therefore, the Court must look to purpose for which the Schads obtained the cash advances.[3]

Ms. Schad testified that she used the $3,000 advance to purchase a tanker of gasoline for the Store. The Bank did not controvert this testimony with any admissible evidence. Ms. Schad testified further that she may have deposited the $850 into a personal checking account. However, no evidence was presented by either party as to how the $850 was spent. The Court finds that the $3,000 advance was not a consumer transaction, as it was not used primarily for personal, family, or household purposes, but for a commercial purpose. As to the $850 advance, the Bank failed to meet its burden of proving that it was used primarily for personal, family, or household purposes. Therefore, the Bank is not entitled to the benefit of the presumption of fraud provided by Section 523(a)(2)(C) and has the burden to prove fraud under Section 523(a)(2)(A) to succeed in rendering the Schads' debt non-dischargeable.

**B. Objection to Discharge under Section 523(a)(2)(A).**

This Court has not previously ruled on the issue of dischargeability of credit card debt under Section 523(a)(2)(A). The state of the law regarding the applicability of Section 523(a)(2)(A) to credit card fraud is in flux and is plagued with unfortunate contortions of the law in order to make lawful credit card use fit into the framework of Section 523(a)(2)(A), which clearly requires fraud.

The well-settled law of Section 523(a)(2)(A) requires that a creditor prove the following elements of fraud by a preponderance of the evidence: [4]

The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss.

*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996).[5] Tremendous elasticity must be inflicted upon the plain language of these elements in order to find that debts incurred by ordinary credit card use are non-dischargeable, however.

There is no doubt that credit card debt *can* be fraudulent and therefore non-dischargeable under Section 523(a)(2)(A). A debtor could use a stolen card; misrepresent his or her identity, employment, or other information (other than financial) in obtaining a card; grossly exceed credit limits; or use a revoked card—these circumstances may involve misrepresentation of material facts upon which a creditor or its agents could justifiably rely, *i.e.*, identity or authority to obtain credit. A challenge to the discharge of debts incurred by the lawful use of a credit card by a cardholder within the parameters of an existing agreement between the cardholder and the creditor, however, has generated a profusion of legal fiction that this Court does not believe is warranted in light of the structure of Section 523. An initial review and rejection of popular theories that this Court believes are insupporta-

---

**3.** Each charge or advance is a credit "transaction" under the CCPA. "[I]ndividual transactions completed through the use of the card should ... be considered as discreet extensions of credit." *Goldman v. First National Bank of Chicago*, 532 F.2d 10, 18 n. 13 (7th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976) (referring to "open end credit plans" under the CCPA). "There is no extension of credit simply by the issuance of the card.... Until the consumer negotiates a transaction using the credit card there has been no extension of credit[,] no debt

has accrued and the creditor's funds have not been transferred to the use of the borrower." *Id.* at 18.

**4.** *See Grogan v. Garner*, 498 U.S. 279, 285–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

**5.** The standard of "justifiable reliance" upon a false representation was established by the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

ble by the statutory scheme is therefore necessary.

Sections 523(a)(2)(B) [6] and 523(a)(2)(C) of the Bankruptcy Code were carefully constructed to address the two most likely forms of credit card fraud, *i.e.*, misrepresenting financial circumstances and "loading up" charges of a consumer nature with the intent to discharge the debt in bankruptcy, respectively. In light of the fact that two subsections of Section 523(a)(2) are specifically tailored to address misrepresentation of financial condition and "loading up," statutory construction dictates that the Court require a creditor to prove misrepresentation of a financial condition under subsection (B) and "loading up" under subsection (C) and not otherwise.

To illustrate, because Section 523(a)(2)(B) requires that any misrepresentation of financial condition be in writing, a creditor may not claim that an oral misrepresentation of financial condition is fraud under subsection (A), because such a result would eviscerate the writing requirement contained in subsection (B). In addition, Section 523(a)(2)(A) specifically excludes from its scope any misrepresentation of financial condition. For that reason, many courts hold that if an oral misrepresentation of financial condition cannot support fraud, then an implied misrepresentation of financial condition, one that is not written or spoken by the debtor, but implied by the circumstances, is also insufficient to prove fraud. *See e.g., First Card Services, Inc. v. Kitzmiller (In re Kitzmiller)*, 206 B.R. 424, 426 (Bankr.N.D.W.Va. 1997); *Norwest Bank of Iowa, N.A. v. Orndorff (In re Orndorff)*, 162 B.R. 886, 889–90 (Bankr.N.D.Okla.1994) ("if a creditor in extending credit wishes to rely on representations as to a debtor's financial condition, it must obtain these representations in writing") (and cases cited therein). These courts therefore reject the argument that the "representation" element of a Section 523(a)(2)(A) fraud claim may be supported by the popular theory that by using a credit card, a debtor makes an "implied representation" that he or she has the ability to pay the debt. Such an implied representation of financial condition, the ability to pay, is wholly insufficient as proof under subsection (B) and therefore cannot rise to any better standing under subsection (A).

Subsection (C) was specifically designed to address the issue of "loading up" credit cards prior to bankruptcy. Congress determined it appropriate to ease the heavy burden of a creditor to prove actual fraud when a debtor incurs debt through "loading up" credit cards or taking cash advances immediately prior to bankruptcy; the statute therefore provides the creditor a statutory presumption of fraud.[7] Congress, however, has made the policy decision that only credit incurred for the purpose of purchasing "luxury goods" is entitled to the presumption of fraud. Purchases of necessities during the sixty day period prior to bankruptcy has not been condemned by Congress as a non-dischargeable event per se. Nor are non-consumer cash advances taken during the sixty day pre-bankruptcy period deemed to rise to the level of conduct that would render debt non-dis-

---

**6.** Section 523(a)(2)(B) renders non-dischargeable a debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent such debt is obtained by

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable ... reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

**7.** The legislative intent for enacting 11 U.S.C. § 523(a)(2)(C) was expressed as follows:

Excessive debts incurred within a short period prior to the filing of the petition present a special problem: that of "loading up" in contemplation of bankruptcy. A debtor planning [to] file a petition with the bankruptcy court has a strong economic incentive to incur dischargeable debts for either consumable goods or exempt property. In many instances, the debtor will go on a credit buying spree in contemplation of bankruptcy at a time when the debtor is, in fact, insolvent. Not only does this result in direct losses for the creditors that are the victims of the spree, but it also creates a higher absolute level of debt so that all creditors receive less in liquidation. During this period of insolvency preceding the filing of the petition, creditors would not extend credit if they knew the true facts.

S.Rep. No. 65, 98th Cong., 1st Sess. 9 (1983).

chargeable. *See* 11 U.S.C. § 523(a)(2)(C). The presumption of fraud provided under subsection (C) of Section 523(a) is *the* accommodation made by Congress for credit card creditors who are victimized by debtors who incur credit in contemplation of bankruptcy. In light of the fact that Congress has provided a mechanism through subsection (C) for the relaxation of the burden of proving fraud in certain circumstances for the benefit of this class of creditors, this Court will not assume that Congress intended to further relax for this same class of creditors the burden of proving all elements of actual fraud under subsection (A), through the indefinite and easily malleable theory that a debtor made an implied representation of ability to pay at the time the debt was incurred.

■ Therefore, the Court rejects the theory that by using a credit card or obtaining a cash advance, a debtor makes an "implied representation" of the present or future ability to pay the debt. *See also Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996) ("the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges"); *Chevy Chase Bank v. Briese (In re Briese)*, 196 B.R. 440, 448 (Bankr.W.D.Wis.1996) ("people use credit cards *precisely because they do not have a present ability to pay.* [citations omitted] It is exactly this reality which makes the credit card industry so profitable, and it is why credit card companies often advertise their cards as just the thing to use in an 'emergency.' ").

The Court does recognize a species of common law and statutory fraud in which a promise to perform some act in the future is made without the present intent to ever perform, however. *See e.g.,* 76 O.S.1991, § 2, 3 ("A deceit ... is ... a promise, made without any intention of performing"); *Palmacci*

*v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir.1992); *Jack Master, Inc. v. Collins (In re Collins)*, 28 B.R. 244 (Bankr.W.D.Okla.1983). This type of fraud must be clearly distinguished from the mere failure to perform a promise, which is not fraud but breach of contract. *See Palmacci,* 121 F.3d at 786 (if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation) (and cases cited therein); *Collins,* 28 B.R. at 246 ("a mere promise to be carried out in the future is not sufficient to bar discharge of a debt, even though there is no excuse for the subsequent breach.... The burden is on the plaintiff [creditor] to show a present intent not to fulfil the promise.")

■ The Court accepts the premise that knowingly incurring credit card debt *generally* constitutes an implied promise to repay the debt or an implied representation of an intention to repay the debt. *See e.g., Anastas,* 94 F.3d at 1285; *Briese,* 196 B.R. at 449–50. The contention that the debtor had no actual present intent to ever repay the debt at the time the debt was incurred is an element for which the creditor has the burden of proving by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Intent to deceive a creditor "may be inferred from the totality of the circumstances." *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir.1996).

Many courts have adopted a checklist of factors to determine intent for the purpose of determining dischargeability of credit card debt.[8] While such lists are helpful and appear objectively valid, it must be remembered that it is the *subjective* intent of the debtor that must be shown. This Court is cognizant and wary of the danger of unfairly *imputing* to a debtor an intent that the

---

**8.** At this time the Court declines to adopt or delineate a "list of factors" tending to show intent; the existing case law is replete with such lists. *See e.g., Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996) (adopting the twelve factors set forth in *In re Dougherty*, 84 B.R. 653, 657 (9th Cir. BAP 1988) to establish intent to deceive through circumstantial evidence). Only relevant evidence of intent, whether or not such evidence appears on a list, will assist the Court in determining intent; the Court is not interested in engaging in "factor-counting." Further, the financial condition of the debtor, including evidence regarding the debtor's apparent inability to service the debt, will not be considered in and of itself as evidence of an intent to defraud.

debtor may or may not have had at the time the debt was incurred based upon the *number* of factors that are satisfied. Debtors often incur debt with the actual but perhaps unrealistic desire and intent to repay such debt; the Court declines to find such behavior fraudulent. Furthermore, again, the Court declines to eviscerate the strict writing requirement of Section 523(a)(2)(B) for representations of financial condition by examining the debtor's financial condition, or the debtor's objective ability to repay the debt, as a part of the fraud analysis of Section 523(a)(2)(A). Nor will the Court extend a presumption of *any* element of fraud to credit card debt beyond that which is delineated in Section 523(a)(2)(C).

■ Consequently, a creditor has the heavy burden of making an affirmative showing of *actual* malicious intent of the debtor to defraud that particular creditor, and not merely negligence, ignorance, unrealistic hopes and expectations, or the circumstance of a hopeless state of financial affairs or poor management thereof. *See Anastas*, 94 F.3d at 1286 ("[T]he express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. A finding that a debt is non-dischargeable ... requires a showing of actual or positive fraud, not merely fraud implied by law."); *AT & T Universal Card Services Corp. v. Chinchilla*, 202 B.R. 1010, 1015 (Bankr.S.D.Fla.1996) ("must be enough evidence to support an actual finding of bad faith"); *Briese*, 196 B.R. at 451–52. *See also Collins*, 28 B.R. at 247 (court refused to find fraud in issuing checks for which there were insufficient funds in debtor's account, rejecting the argument that issuing worthless checks for the purchase of goods was "implied fraud;" creditor must prove both an actual misrepresentation and actual intent to defraud).

■ The Bank must prove, therefore, that when the Schads obtained the cash advances, they actually did not intend to repay the Bank. As evidence of the Schads' fraudulent intent, the Bank presented the following: that the Schads had incurred in excess of $64,000 in debt on eighteen credit cards at the time of the bankruptcy; that the Schads' disposable income was insufficient to service the minimum payments on the credit card debt; that the Schads drew almost the entire amount of credit available from the Bank in only two transactions; that the transactions were made less than one month prior to the filing of bankruptcy; and that the Schads were financially troubled to the extent that they were exploring bankruptcy as an option at the time of the transactions although they had not yet retained bankruptcy counsel.

Ms. Schad's testimony indicated that she borrowed money during the period of crisis prior to the bankruptcy in order to keep the Store open, hoping that the Store might again become profitable so that she and the Littlejohns could eventually repay all their debts. She further testified that she obtained the $3,000 cash advance for the purpose of purchasing a tank of gasoline for resale at the Store, because "without gasoline, we didn't have a store." The Bank did not rebut Ms. Schad's testimony that she used the $3,000 advance for gasoline. The Court finds that the purchase of gasoline supports Ms. Schad's testimony that she desired at that time to attempt to keep the Store open to earn money to pay the mounting indebtedness. The Schads themselves derived no personal benefit from the funds— they did not go on vacation or buy a boat, for example, nor did they convert the cash into exempt assets by investing it in a retirement account or home equity. The Court finds that Ms. Schad's testimony rebuts and overcomes the Bank's circumstantial evidence that the timing of the advances indicated the Schad's intent not to repay the debt. The Court therefore concludes that the Bank failed to sustain its burden of proving that the Schads made a material misrepresentation of their intention regarding repayment of the debt to the Bank and that the Schads had an intent to deceive the Bank.

■ Even if the Court found that the Schads had intended to deceive the Bank by obtaining the cash advances, the Bank did not prove that any reliance it may have had upon any implied representation that the Schads may have made was justified. Al-

though the United States Supreme Court, in *Field v. Mans, supra,* imposed a justifiable reliance standard on the element of reliance necessary to prove fraud in connection with Section 523(a)(2)(A), the Supreme Court did not provide any clear guidance as to what is justifiable reliance in a credit card case. Outside the confines of Section 523(a)(2)(C), in which the elements of fraud, including reliance, are presumed, it is unlikely that a credit card issuer will be able to prove justifiable reliance if it did nothing to protect itself from irresponsible credit card use other than reviewing third-party credit reports which the Court finds to be so superficial in scope as to make them unreliable predictors of solvency, income, budget, work history, and other data relevant to the creditworthiness of a customer.

 The Bank not only approves a customer for a solicitation but also determines a *credit limit* for a credit card customer without ever inquiring into the customer's current solvency, income, budget, work history or assets, and allows the customer to charge up to that credit limit until the Bank revokes the card or reduces the credit limit. To then accuse a customer with fraud for using the card exactly in the manner the Bank permitted, and, in fact, encouraged, is audacious, oppressive and hypocritical. The concept of "wilful blindness," or a conscious avoidance of relevant knowledge, appears to play a significant part in the offering of credit by the Bank and other credit card issuers that have appeared before this Court. Credit card issuers have been willing to assume the risk of using less reliable methods of determining to whom to extend credit and to what extent, apparently because the costs resulting from default are greatly outweighed by the profits earned by virtue of merchant overrides and finance charges collected from performing customers. Issuers therefore must expect, and assume the risk of, a certain rate of default when adopting a marketing strategy that allows credit to be offered without an investigation of potential customers' present financial condition. While a creditor has the right to choose to make reckless credit deci-

sions based upon the economic advantage it gains through market saturation, such a choice does not justify the creditor to rely upon a debtor's implied representation to pay. "Improvident creditors are not to be afforded special protection in bankruptcy for the assumption of common business risks." *First USA Bank v. Hunter (In re Hunter),* 210 B.R. 212, 215 (Bankr.M.D.Fla.1997).

The Tenth Circuit Court of Appeals expressed such sentiment in *Bellco First Federal Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358 (10th Cir.1997).

A creditor who forsakes that protection [of obtaining a written statement of financial condition], abandoning caution and sound business practices in the name of convenience, may find itself without protection. For example, in *In re Ward,* 857 F.2d 1082 (6th Cir.1988), the court denied nondischargeability where the debtor filled in the credit card application and the bank issued a $2,000 credit line and credit card to "a person who was not only hopelessly insolvent, but who had recently been convicted of an embezzlement offense." *Id.* at 1083. The court reasoned a bank's extending that sort of risk must do some minimal investigation, a concept the Bankruptcy Code embodies.

One commentator has written, "[F]rom the perspective of the bankruptcy proceeding, it is inequitable to reward a possible imprudent creditor who failed to detect the debtor's misrepresentation by excepting her debt from discharge, while the debtor's other more prudent creditors have their claims evaluated collectively." Zeigler, The Fraud Exception to Bankruptcy, 38 Stan.L.Rev. 891, 907–08 (1986). Other courts have noted a creditor who extends credit without proper investigation is not entitled to a judgment of nondischargeability. *Citibank v. Cox (In re Cox),* 150 B.R. 807 (Bankr.N.D.Fla.1992); *First Card Services, Inc. v. Cronk (In re Cronk),* 144 B.R. 903 (Bankr.M.D.Fla.1992). This authority demonstrates a reluctance to part from the precise language of the Code to acknowledge and condone business practices which

have been adopted largely for the sake of convenience.

*Id.* at 1361–62.

The method of evaluating potential customers of credit card issuers, including the Bank in this case [9]—that of eliminating known bad risks and relying solely upon historical data in credit reports for the remaining pool of potential customers—appears to have been adopted for convenience; it requires no actual interaction with the potential customer. Such convenience, however, is antithetical to the settled safe business practice of (1) obtaining current financial information and (2) obtaining such information in writing.

Issuers, including the Bank, therefore knowingly risk the possibility of issuing credit to customers without the financial resources to repay. The Schads are a prime example of such risk. The Bank issued a $4,000 credit line to a couple who earned $1,700 per month, had medical problems and debts, and a failing business. A minimal investigation by the Bank, or a few questions on a written credit application, would have revealed the same state of financial affairs that the Bank now finds to be indicative of fraudulent use of the credit it willingly extended a few months before such use. The Court finds no justification for the Bank's blind optimism that the Schads would or could repay the cash advances.

For the reasons stated herein, the Court concludes that the Bank has not met its burden of proof under either Section 523(a)(2)(A) or 523(a)(2)(C) and the debt is therefore dischargeable. Further, the Bank's request for attorney's fees is **denied.**

A separate judgment will be entered consistent with this Memorandum Opinion.

---

9. The Bank's bankruptcy specialist, Vicki McKibbon, testified that it "scoured" the AARP list of potential customers to eliminate those whose credit reports generated a score lower than the minimum acceptable score set by the Bank for issuance of credit. The criteria for scoring includes whether the potential customer has a history of late or no payment on other accounts, amount of outstanding installment loans, status of student loans, how many credit inquiries have been made to the reporting agency, the amount of unused lines of credit, amount of balances on existing cards, collection actions, whether the customer uses a post office box, etc.

Those potential customers who are not eliminated on the basis of their credit reports are solicited by the Bank to receive a credit card by sending a "pre-approved" application for credit, the amount of which the Bank determines again from the credit report. The entire evaluation of the potential customer's creditworthiness is performed by the Bank before the Bank sends anything to the potential customer and is based solely upon a historical credit report which does not include income information. Once the Bank sends the "pre-approved" application, it must extend the credit offered if the potential customer accepts the offer. The customer accepts the Bank's offer by signing the application and furnishing identification information—no financial information is requested of the customer. The terms under which credit is offered is provided to the customer only after the customer has already accepted the offer of credit.