In re Robert L. KUKUK, also known as Robbie Kukuk, and Dava Beth Kukuk, Debtors.

**CHEVY CHASE BANK FSB, Plaintiff—Appellee,**

v.

**Robert L. KUKUK, Defendant—Appellant,**

**Dava Beth Kukuk, Defendant.**

BAP No. WO–98–018.
Bankruptcy No. 97–13863.
Adversary No. 97–1187.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Oct. 20, 1998.

Submitted on the briefs: *

Carolyn S. Smith, Ponca City, Oklahoma, on the brief, for Defendant–Appellant.

Robert H. Tips of Tips & Gibson, Tulsa, Oklahoma, on the brief, for Plaintiff–Appellee.

Before CLARK, PEARSON, and ROBINSON, Bankruptcy Judges.

OPINION

CLARK, Bankruptcy Judge.

Robert L. Kukuk, one of the debtors in this chapter 7 case ("Kukuk"), appeals a judgment of the United States Bankruptcy Court for the Western District of Oklahoma finding a portion of his credit card debt to Chevy Chase Bank FSB ("Bank") to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A). For the reasons set forth below, the judgment of the bankruptcy court is REVERSED, and the matter is REMANDED for a decision consistent with this Opinion.

---

* After examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. Bankr.P. 8012; 10th Cir. BAP L.R. 8012–1(a). The case is therefore ordered submitted without oral argument.

## I. *Appellate Jurisdiction*

We have jurisdiction over this appeal. The bankruptcy court's judgment ends the dispute between the parties on the merits and is a final judgment subject to appeal under 28 U.S.C. § 158(a)(1). *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Kukuk's notice of appeal was timely filed under Fed. R. Bankr.P. 8002, and the parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the Western District of Oklahoma. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

## II. *Background*

The bankruptcy court made the following relevant findings of fact, which have not been contested by Kukuk on appeal. In September 1996, a telemarketer, who was an agent of the Bank, contacted Kukuk to determine whether he desired to obtain a credit card from the Bank. The telemarketer obtained Kukuk's social security number, address, telephone number, birth date, mother's maiden name, place of employment, salary, and the amount of his monthly mortgage payment. The Bank then obtained a credit bureau credit report for Kukuk that revealed that he and his spouse had a total of ten credit cards, five bank credit cards and five retail credit cards. At that time, however, Kukuk and his spouse actually had twenty-one cards, with an aggregate balance of approximately $50,500.[1]

The Bank subsequently approved Kukuk for credit in the amount of $5,000 based on the information that Kukuk gave the telemarketer and the incomplete credit report. A credit card was issued to Kukuk on October 1, 1996. Immediately after receiving the credit card, Kukuk's spouse, with his permission, charged purchases with and made several cash advances against the credit card in the total amount of $4,111.47.

On April 23, 1997, Kukuk and his spouse (collectively, the "debtors") filed a petition seeking relief under chapter 7. The Bank commenced an adversary proceeding against the debtors, asserting that the credit card debt should be excepted from discharge under § 523(a)(2)(A), (B) and (C). Kukuk's spouse was thereafter dismissed from the action because the credit card was not in her name and she was not a debtor of the Bank.

At trial, the debtors testified, *inter alia*, that they had no idea that they were in financial trouble as they had been able to pay the minimum amount due on all of their credit cards. It was not until December 1996 that they discovered the amount of their debt while they were paying their bills. Kukuk's spouse testified that she was not certain what the cash she obtained with the credit card had been used for, but she assumes that the money was spent on Christmas presents.

The bankruptcy court dismissed the Bank's § 523(a)(2)(B) and (C) actions against Kukuk, but concluded that $1,428.00, that portion of the total $4,111.47 debt attributable to cash advances and related fees ("Cash Advance Debt"), was nondischargeable under § 523(a)(2)(A). In so holding, the bankruptcy court stated that Kukuk had made false representations regarding the cash advance transactions with an intent to deceive the Bank on which the Bank justifiably relied, and that the Bank had sustained a loss as a result of Kukuk's misrepresentations. The existence of a false representation was based on the debtors' "implied representation" that they had a present intention and ability to repay the indebtedness created when the credit card was used to obtain the Cash Advance Debt. Concluding that the implied representation theory did not apply to the debt attributable to the debtors' purchase of

---

1. There is nothing in the record to suggest that the credit report was incomplete due to the actions of Kukuk, or that the Bank knew that it had obtained an incomplete report. This is not a case in which Kukuk has made misrepresentations in order to obtain a credit card. Rather, this case is limited to facts involving the use of a properly obtained credit card. Furthermore, this case does not involve credit card kiting, *i.e.*, where a debtor systematically uses his or her credit card to obtain funds to pay the minimum balance on other credit cards. *See, e.g., Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996).

goods or services, but only to the Cash Advance Debt, the bankruptcy court stated:

> It is somewhat plausible that a debtor who uses a charge card to purchase goods or services could not have the ability to repay at that time, but could reasonably believe he could repay the debt in the future, somewhat akin to an installment plan. However, it is more difficult to believe that a debtor who obtains a cash advance, and thus must be acutely aware of his precarious financial condition, has any reasonable belief that he will be able to repay that cash advance. Based upon the facts presented in this case, the Court is of the opinion that [Kukuk's] wife, on his behalf, made an implied representation that she and [Kukuk] had the ability to repay the cash advances she obtained, and that representation was false.

The bankruptcy court also found that the debtors made the false implied representation with an intent to deceive the Bank because they "incurred the indebtedness arising from the cash advances with reckless disregard for their financial circumstances." The court stated that "[t]he inability of these debtors to repay the cash advances, coupled with their reckless disregard for the financial circumstances constitutes fraud within the meaning of § 523(a)(2)(A)." Finally, the bankruptcy court held that the Bank justifiably relied on the implied representations because Kukuk's credit report did not raise any "red flags," Kukuk made minimum monthly payments on his debt each month, and he did not spend beyond his credit limit.

Kukuk timely filed this appeal, requesting only a determination as to whether the bankruptcy court erred in determining that the Cash Advance Debt was nondischargeable as a matter of law under § 523(a)(2)(A).[2] The Bank has not cross-appealed the bankruptcy court's determination that, other than the Cash Advance Debt, the credit card debt is not excepted from discharge under § 523(a)(2)(A), (B) or (C).

## III. Discussion

▮ The only section in contention in this appeal is § 523(a)(2)(A) of the Bankruptcy Code, which provides, in relevant part, that:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> ...
>
> (2) for money ... to the extent obtained by—
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C. § 523(a)(2)(A). The terms "false pretenses," "false representation," and "actual fraud" in § 523(a)(2)(A) are interpreted according to their definitions developed under common law. *Field v. Mans*, 516 U.S. 59, 69 & n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). This section is to be narrowly construed with all doubts resolved in Kukuk's favor. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir.), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995); *First Bank v. Mullet (In re Mullet)*, 817 F.2d 677, 680 (10th Cir.1987); *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986).

The bankruptcy court concluded that Kukuk made false representations in obtaining the Cash Advance Debt.[3] This holding was based on the theory of "implied representation," *i.e.*, when Kukuk's spouse used his credit card with his permission to obtain a cash advance she or Kukuk made a representation that they had both a present intention and ability to repay the indebtedness created

---

2. On the same day that Kukuk filed his opening brief, he also filed a "Motion to Supplement Statement of Issues." The Bank has not objected to Kukuk's motion, and we see no prejudice that would result by granting the motion. Accordingly, the motion is granted.

3. Kukuk's spouse, not Kukuk, made all of the cash advances against Kukuk's credit card with Kukuk's permission. While there is a question as to whether Kukuk's spouse's representations can be imputed to Kukuk under these facts, the issue has not been raised on appeal and, therefore, we will not address it.

thereby. The issue herein is whether a "false representation" as required under § 523(a)(2)(A) may be based on such an implied representation. The Tenth Circuit has not addressed this issue in a decision with precedential authority; *but see Signet Bank v. Keyes*, 959 F.2d 245, 1992 WL 66723 (10th Cir.1992) (table) (in an unpublished decision with no precedential authority, the court held that the debtors' use of credit cards to charge purchases and to obtain cash advances implied a representation by the debtors to the bank that they had the ability and intention to pay the obligations); and lower courts in the Tenth Circuit, as well as numerous other courts, are divided as to whether an implied representation of an intent and ability to repay a credit card debt is sufficient to show that the debtor made a false representation under § 523(a)(2)(A). *Compare Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir.1998) (fraud under § 523(a)(2)(A) may not be based on an implied representation of ability to repay, only of intent to repay; fraudulent intent is based on the totality of the circumstances), *cert. denied*, 67 U.S.L.W. 3169, — U.S. —, 119 S.Ct. 438, — L.Ed.2d — (1998) (No. 98–352); *accord American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122 (9th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997); *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280 (9th Cir.1996); *Bank of New York v. Le (In re Le)*, 222 B.R. 366 (Bankr.W.D.Okla.1998); *Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store)*, 221 B.R. 265 (Bankr.N.D.Okla. 1998); *AT & T v. Herrig (In re Herrig)*, 217 B.R. 891 (Bankr.N.D.Okla.1998); *Household Credit Servs. v. Melton (In re Melton)*, 217 B.R. 869 (Bankr.D.Colo.1998); *Norwest Bank v. Orndorff (In re Orndorff)*, 162 B.R. 886 (Bankr.N.D.Okla.1994) (citing cases and law review articles); *First Card v. Leonard (In re Leonard)*, 158 B.R. 839 (Bankr.D.Colo. 1993); *with Mercantile Bank v. Hoyle (In re Hoyle)*, 183 B.R. 635 (Bankr.D.Kan.1995)

(fraud under § 523(a)(2)(A) may be based on an implied representation of intent and ability to repay, but totality of the circumstances is considered in determining intent); *accord Household Bank v. Touchard (In re Touchard)*, 121 B.R. 397 (Bankr.D.Utah 1990); *The May Dep't Stores Co. v. Kurtz (In re Kurtz)*, 110 B.R. 528 (Bankr.D.Colo.1990); *and with Household Credit Servs., Inc. v. Peterson (In re Peterson)*, 182 B.R. 877 (Bankr.N.D.Okla. 1995) (court assumed that fraud under § 523(a)(2)(A) was based on an implied representation of intent and ability to repay); *and with First Nat'l Bank v. Roddenberry*, 701 F.2d 927 (11th Cir.1983) (only debt incurred after a debtor learns of the issuer's revocation of his or her credit card are nondischargeable under § 523(a)(2)(A)); *see Chase Manhattan Bank (U.S.A.) N.A. v. Carpenter (In re Carpenter)*, 53 B.R. 724, 728 (Bankr.N.D.Ga.1985).[4]

 Whether the bankruptcy court applied the correct legal standard under § 523(a)(2)(A) is subject to *de novo* review. *See, e.g., Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Kretzinger v. First State Bank (In re Kretzinger)*, 103 F.3d 943, 946 (10th Cir.1996); *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir.1994). Our review requires an analysis of the general common law of torts as understood in 1978 when § 523(a)(2)(A) was enacted. *Field*, 516 U.S. 59, 116 S.Ct. at 443 & n. 9. In *Field*, the Court looked to the treatment of "misrepresentation" in the Restatement (Second) of Torts (1976) [hereinafter "Restatement"], published shortly before Congress enacted the Bankruptcy Code. *Id.* at 70–72, 116 S.Ct. at 444. The Restatement defines "misrepresentation" as:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by

---

4. At this time, there are approximately 190 decisions discussing "implied representation" in the context of the use of credit cards and § 523(a)(2)(A). We collect only the published decisions of the Circuit Courts of Appeals and the lower courts in the Tenth Circuit, as they provide an adequate representation of the differing views on this topic.

his justifiable reliance upon the misrepresentation.

Restatement at § 525.[5] This section expressly states that it applies to misrepresentations of "intention." *Id.* The Comments to this section also provide that a representation of fact includes "state of mind, such as the entertaining of an intention...." *Id.* at § 525, Comment *d.* The Comments to § 525 also make clear that the representation may be implied:

> *e. Representation implied from statement of fact.* A misrepresentation of fact may concern either an existing or past fact. A statement about the future may imply a representation concerning an existing or past fact. (See Comment *f* ). To be actionable, a misrepresentation of fact must be one of a fact that is of importance in determining the recipient's course of action at the time the representation is made....
>
> *f. Representation implied from statement promissory in form.* Similarly a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable.

*Id.* at § 525, Comments *e-f.*

The fraudulent nature of the representation is distinct from an intent to deceive to influence another's conduct, the latter being a separate element necessary to liability under the general rule stated in § 525 of the Restatement. *Id.* at § 526, Comment *a.* In determining the former, *i.e.*, the fraudulent nature of the representation, "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." *Id.* at § 530(1). In this regard,

*c. Misrepresentation of intention to perform an agreement.* The rule stated in this Section [530(1) ] finds common application when the maker misrepresents his intention to perform an agreement with the recipient. The intention to perform the agreement may be expressed but *it is normally merely to be implied from the making of the agreement.* Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent and actionable in deceit under the rule stated in § 525. This is true whether or not the promise is enforceable as a contract. If it is enforceable, the person misled by the representation has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract. If the agreement is not enforceable as a contract, as when it is without consideration, the recipient still has, as his only remedy, the action in deceit under the rule stated in § 525.

*Id.* at § 530, Comment *c* (emphasis added). As to the latter, *i.e.*, the expectation of influencing another, the Restatement makes clear that the maker of the representation "is subject to liability to the persons or class of persons whom he intends or has reason to expect to act ... in reliance upon the misrepresentation...." *Id.* at § 531. This includes indirect representations made to third persons:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be

---

**5.** Prior to the Supreme Court's decision in *Field*, the Tenth Circuit required the following elements to be satisfied under § 523(a)(2)(A):

(1) the debtor made a false representation;
(2) the debtor made the representation with the intent to deceive the creditor;
(3) the creditor relied on the representation;
(4) the creditor's reliance was reasonable; and
(5) the debtor's representation caused the creditor to sustain a loss.

*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996); *Mullet*, 817 F.2d at 680. This test was expressly modified by the Court's decision in *Field* inasmuch as the Court held that "justifiable," not "reasonable," reliance must be shown. In addition, although the stated test does not differ dramatically from the definition of misrepresentation stated under Restatement § 525, under *Field*, it is more accurate to rely on Restatement § 525 rather than this five-point test.

repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Id.* at § 533; *see Prosser and Keeton on Torts,* p. 744 (5th ed.1984) [hereinafter "*Prosser*"]. For example, misrepresentations to a credit-rating company for the purpose of obtaining credit from a third party may constitute a fraudulent misrepresentation. Restatement at § 533, Comment *f*.

■ Reliance on the misrepresentation must be "justifiable." *Id.* at §§ 525, 537, & 544; *Field,* 516 U.S. at 70–72, 116 S.Ct. 437. "The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out." Restatement at § 544.

Misrepresentation, as established under the Restatement, therefore, includes an implied representation regarding a debtor's intent to perform under a credit card agreement when he or she uses the credit card. Although such a representation may not be made directly to the credit card issuer, but rather to a third party, such as a merchant, the credit card issuer may justifiably rely on such an implied representation of intention in extending credit to the debtor. The issue in this case is the scope of the implied representation of intention that is actionable under the Restatement and § 523(a)(2)(A) of the Bankruptcy Code.

■ As noted, the bankruptcy court held, in accord with numerous other courts, that as to the Cash Advance Debt, Kukuk had made an implied representation as to his intent to repay *and* his ability to repay the Cash Advance Debt. While both such implied representations may be actionable under the Restatement's definition of "misrepresentation," an implied representation regarding the debtor's ability to repay is not grounds for nondischargeability under § 523(a)(2)(A). In particular, § 523(a)(2)(A) expressly modifies the common law definition of "false misrepresentation" by exempting "statement[s] respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A); *see Field,* 516 U.S. at 66, 116 S.Ct. 437; *Rembert,* 141 F.3d at 282; *Anastas,* 94 F.3d at 1285; *Le,* 222 B.R. at 370; *Herrig,* 217 B.R. at 896 n. 2; *Melton,* 217 B.R. at 875; *Orndorff,* 162 B.R. at 889–90; 4 *Collier on Bankruptcy,* ¶ 523.08[6] (Lawrence P. King ed., 15th ed. rev.1998) [hereinafter "*Collier*"]. Thus, we hold that, for purposes of dischargeability under § 523(a)(2)(A), the use of a credit card creates an implied representation that the debtor intends to repay the debt incurred thereby, but does not create any representation regarding the debtor's ability to repay the debt. *Accord Rembert,* 141 F.3d at 281; *Anastas,* 94 F.3d at 1287; *Kountry Korner,* 221 B.R. at 272; *Herrig,* 217 B.R. at 896 & n. 2.

Our holding is supported by the fact that in most instances an implied representation regarding an ability to repay would not be actionable under the Restatement and, therefore, under § 523(a)(2)(A), because a credit card issuer could not argue that it justifiably relies on such a representation. As pointed out by the bankruptcy court, it is well-known that credit cards are marketed by issuers and often used by consumers because they lack the ability to pay at the time that they use the card. *Rembert,* 141 F.3d at 281. Thus, sophisticated credit card issuers cannot justifiably rely on a representation that a debtor has the ability to repay at the time that he or she uses the card. *See Field,* 516 U.S. at 70–71, 116 S.Ct. 437 (defining "justifiable reliance"); *see also Kountry Korner,* 221 B.R. at 274 (discussing lack of justifiable reliance on the part of credit card issuers, the court stated: "To … accuse a customer with fraud for using the card exactly in the manner the Bank permitted, and, in fact, encourages, is audacious, oppressive and hypocritical."); *Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440, 448 (Bankr. W.D.Wis.1996) ("[P]eople use credit cards precisely because they do not have a present ability to pay. It is exactly this reality which makes the credit card industry so profitable, and it is why credit card companies often advertise their cards as just the thing to use in an 'emergency.' " (citations omitted)).

■ Having concluded that the use of a credit card creates an implied representation regarding a debtor's intent to repay, but not

his or her ability to pay, the next inquiry must be whether the representation is fraudulent. 11 U.S.C. § 523(a)(2)(A); Restatement at § 526 & Comment *a*. This issue requires a determination as to whether the debtor subjectively intended to repay the debt when he or she made the implied representation that in fact he or she intended to do so, *i.e.*, when the credit card was used to incur the debt subject to discharge. An implied representation of intent to repay will be fraudulent if the credit card issuer demonstrates that at the time the debtor used a credit card he or she had no intent to repay the debt incurred. Restatement at § 530(1); *see Rembert*, 141 F.3d at 281–82; *Anastas*, 94 F.3d at 1285–86; *Kountry Korner*, 221 B.R. at 272; *Collier*, ¶ 523.08[6]. The debtor's intent cannot be inferred solely by the fact that the debtor does not repay the credit card used and seeks bankruptcy protection. Restatement at § 530(1), Comment *d* (An intention not to perform under an agreement cannot be "established solely by proof of . . . nonperformance [under the credit card agreement], nor does [the promisor's] failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into."); *Kountry Korner*, 221 B.R. at 272 (fraud "must be clearly distinguished from the mere failure to perform a promise, which is not fraud but breach of contract"); *Collier*, ¶ 523.08[1][d] at 523–44 ("The failure to perform a mere promise is not sufficient to make a debt nondischargeable, even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." (footnote omitted)). Rather, since a debtor will rarely admit a lack of intention to repay, such intent must be. inferred by the totality of the circumstances of the case at hand. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir.1996); *accord Hashemi*, 104 F.3d at 1125 (quoting *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1087 (9th Cir.1996)). A finding regarding fraudulent intent, therefore, will be determined on a case-by-case basis, with the particular circumstances of the case and the demeanor and credibility of the witness playing a very large role.

Numerous courts have applied the following nonexclusive list of factors to determine a debtor's intent under the totality of the circumstances test for purposes of § 523(a)(2)(A):

(1) the length of time between the charges made and the filing of bankruptcy;

(2) whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

(3) the number of charges made;

(4) the amount of the charges;

(5) the financial condition of the debtor at the time the charges were made;

(6) whether the charges were above the credit limit of the account;

(7) whether the debtor made multiple charges on any given day;

(8) whether or not the debtor was employed;

(9) the debtor's employment prospects;

(10) the debtor's financial sophistication;

(11) whether there was a sudden change in the debtor's buying habits; and

(12) whether the purchases were made for luxuries or necessities.

*Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988) (adopted in *Eashai*, 87 F.3d at 1088 & 1090); *accord, e.g., Melton*, 217 B.R. at 876 & n. 3; *Hoyle*, 183 B.R. at 638; *Orndorff*, 162 B.R. at 889; *Kurtz*, 110 B.R. at 530. While these factors are helpful in determining the debtor's state of mind, the test adopted herein requires " 'a review of the circumstances of the case at hand, . . . not a comparison with circumstances (a/k/a/ 'factors') of other cases.' " *Rembert*, 141 F.3d at 282 (quoting *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr.N.D.Ill. 1995)); *accord Hashemi*, 104 F.3d at 1122 ("[T]hese factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent."); *Kountry Korner*, 221 B.R. at 272 n. 8 ("the Court is not interested in engaging in 'factor counting,' " as it is the

subjective intent of the debtor that must be shown); *Herrig,* 217 B.R. at 897 (factors are merely guidelines which are not to be applied as a litmus test, and courts should not engage in simple mathematics to determine dischargeability based on the number of factors met); *Touchard,* 121 B.R. at 401 & n. 5 (factors serve as guidance only); *In re Faulk,* 69 B.R. 743, 747 (Bankr.N.D.Ind. 1986) (same); *Carpenter,* 53 B.R. at 730 (same). Thus, the non-exclusive list of factors stated above should serve as mere guidelines, with no one factor being determinative. Focusing on the circumstances of a particular case, and not a laundry list of factors, is required if the rule that the creditor has the burden to prove each element of fraudulent misrepresentation and nondischargeability under § 523(a)(2)(A) is to be heeded. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (creditor has burden of proving § 523(a) exceptions to discharge by a preponderance of the evidence); *see Kountry Korner,* 221 B.R. at 272; *Dougherty,* 84 B.R. at 656. Furthermore, such a reading comports with the fact that the Tenth Circuit has stated that § 523(a)(2)(A) "includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality." *Black,* 787 F.2d at 505; *see* 124 Cong. Rec. H 11,095–96 (daily ed. Sept. 28, 1978); S17,412–13 (daily ed. Oct. 6, 1978) (§ 523(a)(2)(A) was intended to codify case law as expressed in *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1878), which interpreted fraud to mean actual or positive fraud rather than fraud implied by law), *cited in Collier,* ¶ 523.08[1][e].

▬ As noted above, one of the factors considered by the courts in determining whether fraudulent intent exists under the totality of the circumstances test is the debtor's financial condition at the time that the credit card was used, or the debtor's ability to pay the debt incurred. This factor, like all of the other factors stated above, should not be dispositive on the issue of fraudulent intent, but may be a necessary part of inferring whether or not the debtor incurred the debt with no intent of repaying it. We stress, however, that in considering the debt-

or's ability to pay under the totality of the circumstances test, "the hopeless state of a debtor's financial condition should never become a substitute" for an finding of fraudulent intent. *Anastas,* 94 F.3d at 1286 (citations omitted), *quoted in Rembert,* 141 F.3d at 281; *see Kountry Korner,* 221 B.R. at 272 n. 8 (a debtor's inability to finance a debt will not in and of itself be evidence of fraud); *Herrig,* 217 B.R. at 897 & n. 3 (same); *Collier,* ¶ 523.08[6] at 523–57 ("That the debtor's financial condition at the time the charges were incurred may have made it objectively unreasonable to believe that the debtor had the ability to pay the charges does not by itself establish grounds for nondischargeability. But such evidence may support the inference that the debtor had the requisite fraudulent intent." (footnotes omitted)). Indeed, in considering the debtor's ability to pay a credit card debt under the totality of the circumstances test, the inquiry should be limited to whether the debtor had the ability to pay the debt within the terms of his or her credit card agreement. For example, many credit card agreements only require a debtor to make minimum monthly payments. Thus, in considering ability to pay, the court should determine whether the debtor had the ability to make the minimum monthly payment at the time the debt was incurred. We also note that when a creditor issues a preapproved credit card to an already insolvent debtor, "the creditor cannot draw any adverse inferences from the debtor's use of the card while insolvent." *Collier,* ¶ 523.08[6] at 523–58 (footnote omitted) (citing *In re Hunter,* 780 F.2d 1577 (11th Cir.1986)).

▬ A reckless disregard for the truth of a representation, such as an implied representation that the debtor intends to repay debt incurred through the use of a credit card, may constitute fraud. However, "reckless disregard" should be very narrowly interpreted. The Restatement makes clear that a misrepresentation is fraudulent only if the maker "knows or believes that the matter is not what he represents it to be." Restatement at § 526(a). The Comment to this section states:

> The fact that the misrepresentation is one that a man of ordinary care and intelli-

gence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation ..., but it is evidence from which his lack of honest belief may be inferred. So, too, it is a matter to be taken into account in determining the credibility of the defendant if he testifies that he believed his representation to be true. *Id.* at § 526(a), Comment *d.* A "line is to be drawn between an intent to mislead and mere negligence. An honest belief, however unreasonable, that the representation is true and the speaker has information to justify it [has been] held ... to be no sufficient basis for deceit." *Prosser* at p. 742. A debtor's unreasonably optimistic view that he or she could repay the debt when it was incurred, therefore, does not constitute fraud if the debtor intended to repay the debt when it was incurred. *Eashai*, 87 F.3d at 1090 ("A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight." (quoting *Karelin v. Bank of America Nat'l Trust & Sav. Ass'n (In re Karelin)*, 109 B.R. 943, 948 (9th Cir. BAP 1990))); *Kountry Korner*, 221 B.R. at 274. Thus—

> [C]ourts faced with the issue of dischargeability of credit card debt must take care to avoid forming the inquiry under section 523(a)(2)(A) as whether the debtor recklessly represented his financial condition. The correct inquiry is whether the debtor either intentionally or with recklessness as to its true or falsity, made the representation that he intended to repay the debt.

*Anastas*, 94 F.3d at 1286.

We are cognizant that the test adopted herein creates a very difficult burden for credit card issuers under § 523(a)(2)(A). However, this test is mandated by the express language of § 523(a)(2)(A), and interpretation of the terms therein mandated by the Supreme Court in *Field.* Furthermore, credit card issuers are not without remedies to obtain nondischargeability judgments against "dishonest debtors." Section 523(a)(2)(B) protects credit card issuers in instances where debtors make written statements concerning their financial condition in order to obtain credit, and § 523(a)(2)(C) creates a presumption that debts in excess of $1,000 for luxury goods or services or for cash advances aggregating more than $1,000 incurred within sixty days prior to the petition date are nondischargeable. 11 U.S.C. § 523(a)(2)(B)-(C). To find any lesser standard under § 523(a)(2)(A) then the one stated herein would eviscerate the strict writing requirement under § 523(a)(2)(B), *see Kaspar*, 125 F.3d at 1361–62, and would extend a presumption of fraud beyond that expressly provided for in § 523(a)(2)(C). *Kountry Korner*, 221 B.R. at 272 ("In light of the fact that Congress has provided a mechanism through subsection (c) for the relaxation of the burden of proving fraud in certain circumstances for the benefit of [credit card issuers], this Court will not assume that Congress intended to further relax for this same class of creditors the burden of proving all elements of actual fraud under subjection (A), through the indefinite and easily malleable theory that a debtor made an implied representation of ability to pay at the time the debt was incurred.") & 273 (recognizing argument above); *see Field*, 516 U.S. at 64–66, 116 S.Ct. 437 (noting differences between § 523(a)(2)(A) and (B)), *quoted in Kaspar*, 125 F.3d at 1362.

■ The bankruptcy court erred as a matter of law in basing its finding of nondischargeability under § 523(a)(2)(A) on Kukuk's implied representation that he had the ability to repay the Cash Advance Debt when the Debt was incurred or due to his reckless disregard as to his financial condition. The sole inquiry is whether the Bank proved that the debtors did not intend to repay the Cash Advance Debt at the time that the Debt was incurred. The bankruptcy court's factual findings, an independent reading of the transcript, and the rule that doubts regarding dischargeability are to be resolved in the debtor's favor, *see supra* at p. 782, leads us to believe that the debtors did not have the requisite fraudulent intent.[6] However, since

---

6. The debtors testified that they did not understand their financial plight until they were paying their bills in December 1996. Up until that time they had made minimum monthly payments on their credit card. After that time they did not use any of their credit cards at all. Their last

the demeanor and credibility of the debtors is so important to determining intent, it is appropriate to remand this case to the bankruptcy court. Fed. R. Bank. P. 8013 (on appeal "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses").

 In so doing, we note that the bankruptcy court's distinction between purchases and cash advances is erroneous. The bankruptcy court improperly assumed, not based on any evidence, that when a debtor obtains a cash advance there is no reason to believe that he or she has the ability or intention to repay. This assumption is incorrect as a matter of law. *See Anastas*, 94 F.3d at 1285 n. 2 (noting that for all practical purposes there is no difference in credit card purchase debt and cash advance debt); *see also Rembert*, 141 F.3d at 280–81 (cash advances used for gambling were not excepted from discharge under § 523(a)(2)(A) where creditor did not establish that the debtor had no intent to repay); *Eashai*, 87 F.3d at 1090 (recognizing that a debtor may obtain a cash advance with the intent to repay); *Providian Bancorp v. Shartz (In re Shartz)*, 221 B.R. 397 (6th Cir. BAP 1998) (cash advances were obtained with intent to repay). We see no reason to create a different test for the dischargeability of debts under § 523(a)(2)(A) based on the use of a credit card to purchase goods or services or to obtain cash advances. Furthermore, as pointed out by Kukuk on appeal, if the bankruptcy court is correct in assuming that persons who obtain cash advances will never be able to repay their debts, an action under § 523(a)(2)(A) must fail as a credit card issuer could not argue that it justifiably relied on any implied representation regarding the repayment of a cash advance debt.

#### IV. *Conclusion*

The judgment of the bankruptcy court is hereby REVERSED, and the matter is REMANDED for a decision consistent with this Opinion.

---

charge on the credit card was on December 26, 1996. During a three month period, from the time that the card was issued until the time that they discovered their financial plight, the debtors ran up a $4,100 debt on the credit card, including fees and interest. Kukuk's spouse, who was the primary user of the card, testified that she did not realize how much she was spending at the time that she incurred the debt on the card; just that the debtors had never had a problem paying debts in the past and that she assumed that it was alright to make additional charges on the credit card. The debtors met with bankruptcy counsel for the first time on January 13, 1997, approximately three weeks after making the last charge on the card. They did not, however, file bankruptcy until April 1997, several months after last using the card. The debtors testified that they did not use credit cards to pay other credit cards. They also did not exceed spending limit established by the Bank. No evidence was presented as to the debtors' financial sophistication, or whether the debtors were loading up their cards by engaging in luxury spending or by suddenly changing their spending habits. In fact, it appears as if the debtors had a pattern of using credit cards beyond their ability to repay, and then making minimum monthly payments.