# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

───────────────

m 99-50704
Summary Calendar

───────────────

In the Matter of:     MARSHA LYNN DEISON,

                                            Debtor.

AT&T UNIVERSAL CARD SERVICES CORPORATION,

                                            Appellant,

VERSUS

MARSHA LYNN DEISON,

                                            Appellee.

───────────────────────

Appeal from the United States District Court
for the Western District of Texas
(A-99-CV-267)

───────────────────────

January 18, 2000

Before SMITH, BARKSDALE, and
    PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Marsha Deison accumulated $3,971.05 in cash-advance credit-card debt only a few days before declaring bankruptcy.[1] The bankruptcy court found that her testimony rebutted the statutory presumption that debt acquired in this manner was accumulated without the necessary intent to repay it, and it thus found the debt dischargeable. AT&T Universal Card Services Corporation ("Universal") appealed to the district court, which affirmed. We affirm the decision of the district court.

I.

─────────────

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] We present disputed facts in the light most favorable to the verdict.

Deison held a credit card issued by Universal, with a credit line of $4,500.00, from July 26, 1994, until the beginning of 1998. She made regular use of the card during most of that period. In a four-day period from December 30, 1997, through January 2, 1998, however, she made four cash-advance withdrawals, totaling $3,903.50. On December 30, 1997, she took $400.00 through two cash-advance transactions of $200.00. The following day, she took $3,200.00 in cash through an advance at a bank. On January 2, 1998, she took an additional $300.00 in cash.

This spree represented a substantial increase in activity from previous months and a change in Deison's buying and spending habits. Although her income had declined in 1996 by $7,000 from the prior year, it remained constant in 1996, 1997, and during the first month of 1998. As of the filing date, her net monthly income was $1,806.78.

From 1996 through January 1998, Deison made $21,423.80 in merchandise purchases and cash advances on her various credit cards "to help make ends meet." As of the filing date, her monthly expenses were $1,924.46 without regard to her credit card obligations, and her liabilities were $36,668.80.

Deison testified that she used the cash-advance funds primarily to pay off other bills, bills that she had previously been servicing by drawing down her savings and a small inheritance. She claimed never to have realized the extent of her financial problems and said she intended, at the time she took the $3,900 in cash advances, to repay it.

Deison met with a professional credit counselor on or about January 17 to discuss her financial situation, and, on January 19, she met with her bankruptcy attorney. On January 26, 1998, she filed a petition for relief under chapter 7.

## II.
The bankruptcy court stated the following:

If you look at this case on paper, it definitely strikes one, and I can understand why it would strike Ms. Metz [the witness called by Universal], as being a case that should be investigated and pursued, because within 30 days of bankruptcy you have $3900 being taken in cash advances when that, one, never happened before and, two, it was out of line with what one would expect in view of the debtor's income.

Nonetheless, the court entered judgment for Deison and dismissed the complaint, finding that she intended to pay off the cash-advance withdrawals, thus rebutting the presumption that her withdrawals were fraudulent and defeating Universal's attempt to prove actual fraud.

## III.
The bankruptcy court's conclusions of law are reviewed *de novo*. *Young v. National Union Fire Ins. Co.*, 995 F.2d 547 (5th Cir. 1993) (*citing Allison v. Roberts*, 960 F.2d 481 (5th Cir. 1992)). The bankruptcy court's findings of fact are binding on the district court and this court unless clearly erroneous. When the bankruptcy court's determination has been approved by the district court, we do not disturb it except for the most cogent reasons. *See Boydston v. Sears, Roebuck & Co. (In re Boydston)*, 520 F.2d 1098, 1100 (5th Cir. 1975). Harmless error does not constitute a valid basis for reversal. FED. R. CIV. P. 61.

## IV.

Section 523 of the Bankruptcy Code details the circumstances in which certain debts will not be discharged in bankruptcy, among them being debt accrued "for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523 (a)(2)(A). With regard to certain types of credit card debt, the Code makes a special provision:

[F]or purposes of [11 U.S.C. § 523(a)(2)(A)], consumer debts owed to a single creditor and aggregating more than [$1,075] for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than [$1,075] that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable.

11 U.S.C. § 523(a)(2)(C).

It is undisputed that the debt Deison accrued through her cash-advance withdrawals qualified, under this section, as presumptively nondischargeable. The bankruptcy court, however, found that the evidence in the record overcame the presumption.

As Universal admits, no published circuit court opinion has discussed the presumption created by § 523(a)(2)(C) or the quantum of proof necessary to rebut it. In an unpublished opinion, however, in *Signet Bank/Va. v. Rawoot*, 1993 U.S. App. LEXIS 32091 (4th Cir. Dec. 10, 1993) (*citing FCC Nat'l Bank Card v. Orecchio (In re Orecchio)*, 109 B.R. 285 (Bankr. S.D. Ohio 1989)), the court held that "[t]o rebut this presumption, Mr. Rawoot was required to 'raise [] a substantial doubt in the mind of the [bankruptcy judge] as to the existence of the presumed intent [to defraud

his creditors].'" *Rawoot*, *id.* at *4 (brackets in original).

A number of bankruptcy courts have dealt with this question. In *Orecchio*, the court analyzed the legislative history of § 523(a)(2)(C) and concluded that it

seems to indicate that a debtor needs to do much more than simply present evidence which could support a contrary result. Rather, the debtor must demonstrate non-fraudulent intent in connection with that obligation. Such evidence need not be of the same clear and convincing nature as the creditor is required to show to invoke the presumption, but the Debtor's rebuttal evidence must raise a substantial doubt in the mind of the trier of fact as to the existence of the presumed intent.

*Orecchio*, 109 B.R. at 289-90. Similarly, in *J.C. Penney Co. v. Leaird (In re Leaird)*, 106 B.R. 177, 180 (Bankr. W.D. Wis. 1989), the court said, "To rebut a presumption of fraudulent intent under 11 U.S.C. §523(a)(2)(C), the debtor must directly attack the presumed fact with sufficient evidence to support a finding that the fraudulent intent did not exist."[2]

---

[2] *See also Chase Manhattan Bank v. Sparks (In re Sparks)*, 154 B.R. 766 (N.D. Ala. 1993); *Central Fidelity Nat'l Bank v. Powell,* 213 B.R. 306 (Bankr. W.D. Va. 1997); *Bank One Lafayette, N.A. v. Larisey (In re Larisey)*, 185 B.R. 877, 881 (Bankr. M.D. Fla. 1995).

**3**

In *AT&T Universal Card Servs. v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997), the court used language of particular relevance to this case:

> The legislative history of section 523(a)(2)(C), however, indicates that Congress intended for a debtor to do more than simply present evidence that could support a contrary result. Congress was concerned with what it considered egregious conduct on the part of debtors who incurred debt at a point when their insolvency should have been obvious. In *Orecchio* the Court, therefore, held that a debtor must offer substantial and believable evidence contrary to the presumed intent in order to demonstrate non-fraudulent intent. Otherwise, the usefullness [sic] of the presumption in section 523(a)(2)(C) is destroyed.

*Ellingsworth*, 212 B.R. at 340-41 (footnotes omitted). Courts have also recognized that in attempting to ascertain a debtor's subjective intent, the debtor's testimony is of no probative value. "[S]ince a debtor will rarely admit a lack of intention to repay, such intent must be inferred from the totality of the circumstances of the case at hand." *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786 (B.A.P., 10th Cir. 1998).[3] As the court said in *LA Capitol Fed. Credit Union v. Melançon (In re Melançon)*, 223 B.R. 300 (Bankr. M.D. La. 1998),

> no debtor is going to take the stand and testify against himself. Every debtor in a Section 523(a)(2)(A) action involving cash advances is going to say that he intended to repay the money. Given that this is an inflexible rule of nature, the fact that one particular debtor in one particular case adheres to the rule doesn't establish the debtor's intent . . . . It is insufficient for a debtor to simply state that he always planned to pay the money back "somehow" (we have a mental image of cash suddenly falling from the skies, like manna from heaven). If the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repaySShe may even want to repaySSbut he certainly does not intend to repay.

*Melançon*, 223 B.R. at 318, 321.

Taken together, these cases suggest that the bankruptcy court should have looked for "substantial evidence" that the debtor did not intend to defraud by her cash-advance withdrawals in the sixty days before filing bankruptcy and that a completely unsupported assertion of lack of intent will not suffice. We then review the bankruptcy court's finding of substantial evidence for clear error.

Deison did aver that she did not intend to fail to pay back the cash advances; the bankruptcy court believed her. Facts in the record support that belief.

---

[3] *See also Citibank (S.D), N.A. v. Eashai (In re Eashai)*, 87 F. 3d 1082, 1087 (9th Cir. 1996) ("Since a debtor will rarely admit to his fraudulent intentions . . . ."); *AT&T Universal Card Servs. Corp. v. Rembert*, 14 F. 3d 277, 282 (6th Cir. 1998).

Reading the record in the light most favorable to the finding, we conclude that Deison, a relatively unsophisticated consumer, had always paid at least the minimum balance on her credit cards before her bankruptcy, even as she accrued over $21,000 in debt in a little more than a year. This evidences her intention to continue servicing her debt without fail and suggests that she might have been totally unaware that she had "run out of rope." Too, Deison was employed; she was not entirely bereft of income. Moreover, her uncontroverted testimony was that she used the funds withdrawn to satisfy other liabilitiesSSnot to purchase luxury goods or make other frivolous uses of the funds. Finally, it appears that the transactions had been completed for three weeks before Deison consulted a consumer-credit specialist, who apparently alerted her to the precariousness of her position.

In *Anastas v. American Sav. Bank*, 94 F.3d 1280, 1284 n.1 (9th Cir. 1996), one of the cases to which Universal points in support of its position, the court notes a list of non-exclusive factors that might be considered in determining whether there is intent to repay:

> (1) the length of time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges were made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) the financial sophistication of the debtor; and (12) whether the purchases were made for luxuries or necessities.

*Id.* (*citing Eashai*, 87 F.3d at 1087-88). While we have no intention of adopting this twelve-part test as determinative, we do note that many of the ways in which others have attempted to determine whether fraudulent intent exists suggest that Deison has shown none. Even with reference to these factors, we might, *de novo*, have come to a different decision than did the bankruptcy court about whether Deison's story created substantial doubt of intent. That court, however, did not clearly err.

## V.

Universal also argues that, even if Deison is found to have rebutted the presumption that her cash-advances worked fraud, it made, as a matter of law, the case for fraud, which would still render the debt undischarged under § 523(a)(2)(A). A showing of fraud requires a showing of intentSSthe same intent that the bankruptcy court found lacking when it found that Deison had rebutted the § 523(a)(2)(C) presumption. For the same reasons, we conclude the bankruptcy court did not clearly err in finding that Deison lacked the requisite intent necessary to have committed fraud under § 523(a)(2)(A).

## VI.

Universal contends that the bankruptcy court applied the wrong law in determining whether Deison committed fraud against Universal, and the wrong finding of intent in analyzing the fraud. To the extent that Universal has demonstrated error, however, it has not established harm.

In the beginning of its review of applicable law, the bankruptcy court stated that "[t]he state law definition of fraud generally is a representation knowingly made, knowingly false, with the intent that the other party rely upon it and that they are damaged as a result of that reliance." In determining the nondischargeability of a debt, federal common law, not state law, controls. In *Field*, the Court stated that "[w]e construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field*, 516 U.S. at 70 n.9. The Court then explained that "the most widely accepted distillation of the

common law of torts was the Restatement (Second) of Torts (1976) . . . ." *Id.* at 70.

Universal then points us to *Melançon*, in which the bankruptcy court reviewed the application of the Restatement to § 523(a)(2)(A).

> Section 525 of the Restatement provides: One who fraudulently makes a misrepresentation of fact, opinion, intention, or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation . . . . [T]hat the use of a credit card to obtain a cash advance included with it a promise that the party obtaining the cash advance would pay the money back . . . .

> According to the Restatement (Second) of Contracts, a promise is a manifestation of an intention to act or refrain from acting. The Restatement of Torts states that a promise automatically includes an assertion that the party making the promise intends to fulfill it. The credit card agreement, then, can be viewed as a contract that sets forth certain agreed terms for future contracts that are contemplated by the parties. If a credit card holder decides to exercise his rights under the agreement and borrow some money, he can do so without waiting for bank approval, and without paperwork. He simply goes to the nearest ATM, puts in this card, pushes a few buttons, and takes his cash . . . . .

> But a loan is still a loan . . . . When the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained . . . . Inherent in any request for a loan, in any making of a loan by two parties, is a promise by the borrower to repay the money borrowed.

This is no legal fiction.

*Melançon*, 223 B.R. at 307-08, 311, 316. Thus, in conformity with the Restatement, the use of the credit card, be it for a cash advance or a purchase, is conduct that constitutes a representation that "I will repay the loan."

All of this is true, but all of it illustrates why the bankruptcy court's application of the wrong law of frauds worked no harm. Universal points us to *Melançon* to demonstrate that, had the bankruptcy court employed the Restatement standard, it would have realized that taking a cash advance implicitly makes the "I will repay" representation. Of course, the bankruptcy court noted that

> I believe the credit card agreement makes it clear that the credit card holder makes an express . . . statement they will in fact repay the debt, and that what courts have said is that in order to curb real abuses . . . there should be layered a presumed intention that the party is acting in good faith, that is, that not only do you have an express statement that "I intend to repay it," but that on top of that the facts and circumstances of that particular debtor are such at that time that that is a reasonable belief. I think that's pretty much where the law sits.

Thus, though the bankruptcy court applied the wrong law of fraud, that error was harmless, because the court performed the same functional analysis that Universal would have had it apply under the Restatement's definition of fraud.

Universal also argues that the bankruptcy court erred in that it mentioned that "I do think that . . . . Ms. Deison did not have any contemplation of filing a bankruptcy petition until after this transaction took place." Universal points out that the intent analysis to be undertaken is whether the debtor intended to repay the loan, not whether he intended to file bankruptcy. The cases cited above support this position. The bankruptcy court's error

**6**

was one of locution rather than analysisSSit simply misspoke.

This is shown by the court's statement that "there should be layered a presumed intention that the party is acting in good faith, that is, that . . . you have an express statement that 'I intend to repay it.'" This passage illustrates that the court was well aware of the proper standard when it explicated the relevant legal analysis.

Finally, Universal points to the Restatement, § 530, Comment d, and to *Boydston*, which acknowledge that, in the words of the Restatement, "[f]radulent intent may, however, be proved by circumstantial evidence. Thus, an intent not to pay for goods purchased may be shown by the promisor's insolvency." RESTATEMENT (SECOND) OF TORTS § 530, cmt. d. (1976); *see Boydston*, 520 F.2d at 1101. From this, Universal concludes that "as Ms. Deison could not afford to repay her debts the trial court should have, as a matter of law under the Restatement of Torts, inferred that she did not intend to repay the debt."

We disagree with this logic; that insolvency *may* be used to demonstrate intent not to repay certainly does not *require* the conclusion, as a matter of law, that a consumer debtor who borrows when insolvent has committed fraud. Such a requirement would in fact render the § 523(a)(2)(C) presumption unrebuttable, because almost all consumer debtors are going to be technically insolvent in the days before their declaration of bankruptcy. This is not the law.

AFFIRMED.

**7**