**In re Timothy Colin MCGUIRE, Debtor.**

**R.J. Wolf, Plaintiff,**

**v.**

**Timothy Colin McGuire, Defendant.**

**Bankruptcy No. 01–22173 EEB.**
**Adversary No. 01–1446 EEB.**

United States Bankruptcy Court, D. Colorado.

Sept. 30, 2002.

---

484

Matthew D. Skeen, Georgetown, CO, for Defendant.

## ORDER DENYING OBJECTION TO DISCHARGEABILITY

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on Plaintiff's Complaint, asserting that the debt owed to him in the amount of $35,000 should be declared nondischargeable under 11 U.S.C. § 523(a)(2). It is undisputed that the Defendant made representations which induced the Plaintiff's purchase of an investment and that these representations later proved to be false. The central dispute is whether Defendant had the requisite fraudulent intent. As to the majority of the representations, it is undisputed that Defendant did not know of their falsity at the time he made them. Following a trial, in which only the Plaintiff and Defendant appeared as witnesses, the Court took this matter under advisement to consider whether the degree of Defendant's carelessness in making these statements rose to the level of reckless disregard and, thus, could constitute a basis for finding the necessary element of scienter. As explained more fully below, the Court finds that the Defendant was merely negligent and, thus, is entitled to discharge Plaintiff's claim in his bankruptcy.

## I. FACTUAL BACKGROUND

Defendant was an insurance salesman, who conducted his business through his wholly-owned company, American Assets Management Corp., Inc. ("AAM"), an independent retail insurance brokerage. He sold life insurance policies, annuities, interests in "viatical financial settlements," and other products offered by third-party insurance companies and similar industries. After meeting with the Defendant and reviewing promotional materials supplied by AAM, Plaintiff purchased two insurance-related products through AAM, an annuity contract with National Western Life Insurance Company for $15,000 and a viatical financial settlement from American Benefits Services, Inc. ("ABS") for $35,000.

A viatical financial settlement ("viatical") is the sale by assignment of the benefits

from a life insurance policy, insuring the life of a terminally ill person. As ghoulish as this investment vehicle sounds, it actually allows a terminally ill person in the later stages of a disease, to obtain additional funds with which to secure either the basic means of support or additional comforts during the insured's final days. Undoubtedly, it is especially attractive to those insureds who have no heirs. Companies who issue a viatical are supposed to employ a physician to certify that the insured is in the later stages of a terminal disease. The purchase price for the assignment is never the full value of the policy, but some discounted amount.

In this case, Plaintiff realized the benefits of the annuity contract he purchased through AAM, but completely lost the funds he invested in the viatical. ABS (not AAM) was operating an elaborate "Ponzi scheme," soliciting investors and paying the earlier investors solely from funds received from the later investors, rather than from the proceeds of any insurance policies.[1] ABS issued certificated assignments to Plaintiff, certifying that it had purchased two life insurance policies with his $35,000 and specifying the details of the alleged policies. In reality, it never bought the policies.

ABS was able to perpetrate its fraud, in part, by selling the viaticals through reputable insurance agencies throughout the country, including Defendant's brokerage, AAM. It is undisputed that neither AAM nor Defendant knew anything about the Ponzi scheme, until it was too late. There was nothing about the compensation structure between ABS and AAM that should have raised red flags for the Defendant. AAM's commission from ABS was always within a range of 6–7½%, which is the same commission range it earned on the viaticals

it sold for other businesses. Defendant's company earned only slightly more than $2,000 from Plaintiff's $35,000 purchase. Over the course of time, AAM sold a total of $1.6 million in viaticals to its various clients, but stopped selling ABS' products when Defendant became aware that one of AAM's other customers was experiencing customer service difficulties with ABS. Defendant caused AAM to stop doing business with ABS as soon as the first problem surfaced, without waiting until the Ponzi scheme came to light.

Defendant educated himself regarding viaticals through his attendance of a seminar on viaticals, his inquiry with the state as to any licensing requirements, a meeting with the attorneys of another company that sold viaticals, Mutual Benefits Company, and by reviewing literature prepared by one of the largest administrators of IRAs, Pensco Financial Services, Inc. Based on this training, there was nothing in ABS' promotional materials regarding its viaticals that sounded too good to be true. Unfortunately, Defendant did not investigate ABS, did not demand proof that ABS had actually purchased the subject insurance policies, and did not obtain a copy of the requisite physician's report. Defendant assumed that ABS was doing everything it was supposed to do.

Defendant became involved with ABS, when he was approached by the principal of another company, SunCoast Financial Services, Inc., who was promoting ABS' viatical product. SunCoast provided sales literature and product brochures to Defendant. Defendant studied the sales literature, spoke with SunCoast's representatives, obtained a copy of SunCoast's insurance license, and contacted the Florida State Department of Insurance regarding SunCoast to ensure that it was

---

1. For a brief discussion of the Ponzi scheme perpetrated by ABS, see *Kozyak v. Levy, (In re Fin. Federated Title & Trust, Inc. a/k/a Asset*

*Sec. Corp., a/k/a Quad–B–Ltd., a/k/a Am. Benefits Servs., Inc.)*, 273 B.R. 706, 709 (Bankr. S.D.Fla.2001).

"in good standing." Defendant requested a history and financial statements on both SunCoast and ABS. He did not receive this information as to either company. Nevertheless, Defendant signed a written agency agreement with SunCoast. Defendant testified that he considered himself an agent of ABS, because he agreed to sell products of ABS, as a subagent of SunCoast. He did not have a written agency agreement directly with ABS.

AAM utilized the ABS promotional materials, specifically a brochure and a sample newspaper advertisement. He created a customized brochure for AAM by retyping the ABS sales literature verbatim, merely substituting AAM's name for ABS, so that customers would know to contact him to purchase this product. The customized brochure did not reference ABS as the principal offering the viatical investment. The advertisement stated:

### ARE YOU TIRED OF LOW CD RATES?

**9.86% per year GUARANTEED**

* High Yield

*Completely Insured up to $300,000

* Fixed Return

* No Market Risk

* 3–Year Growth 42%

* Short Term

* Monthly Income Plan Available

* No Hidden Costs

* Principal Liquid

* Great for IRA Rollovers.

Call Today! American Assets Management Corp., Inc., 9025 Kenyon Ave., Suite 305, Denver, CO 80237, (303) 889–5959, Toll Free, (800) 644–1454

Plaintiff responded to this advertisement, by requesting a meeting with Defendant. At the meeting, Defendant explained that he represented various companies. He discussed several products, other than ABS' viatical, including a viatical product offered by another company. Defendant assured Plaintiff at this meeting that neither AAM nor any entity with whom it did business had ever been investigated by a governmental agency. Once Plaintiff narrowed down his investment options, he asked Defendant questions about the products and president of ABS and asked for investor references. Defendant gave Plaintiff telephone numbers for representatives of ABS, but indicated that he could not provide actual investor references.

At a subsequent meeting, Plaintiff met with Defendant to execute the necessary documents to purchase the annuity and the ABS viatical. With respect to the ABS viatical, Plaintiff executed a Participation Agreement, two Letters of Instruction to Trust, two Disbursement Letters of Instruction, and a Suitability Application. Each of these documents were bound into a booklet, with perforated pages, so that the forms could be removed for processing. The booklet was entitled, "Participation Disclosure: Viaticated Insurance Benefits" and contained the name and corporate logo of ABS (not AAM) on the cover.

The introductory paragraph of the Participation Agreement states as follows: "This agreement made this 19th day of October, 1998, by and between the parties, described as AMERICAN BENEFITS SERVICES, INC., and ... R.J. Wolf ...." The Disbursement Letters of Instruction and the Letters of Instruction to Trust require a trust number and the name of the insurance company issuing the policy. Defendant did not supplement

these documents with this information, but left them for ABS to complete. In fact, Defendant acted only as a broker of this transaction and had no involvement in acquiring suitable policies. Thus, he had no access to information with which to complete these forms. Defendant forwarded the documents which had been executed by Plaintiff, and ABS sent certificates of Irrevocable Absolute Assignment of Viaticated Insurance Benefits ("Certificates") to Plaintiff. Each Certificate reflects the trust number and the name of the company that issued the policy. One Certificate purported to transfer an 8.284% interest in a $300,000 policy issued by Aetna and the other purported to transfer an 8.284 % interest in a $300,000 policy issued by New York Life.

The representations contained in the brochure may be categorized into three groups. The first were those that touted the security and liquidity of this investment (the "investment representations"). The second type involved representations that "our company" will purchase the policies, obtain physician's certificates and otherwise handle the acquisition of suitable policies for sale (the "transaction representations"). The third category of representations touted ABS' stability (the "ABS representations"). The brochure states:

> American Assets has been very "choosy" about the companies and products they will offer for sale to the public. The companies must be top rated by one or more of the major industry independent rating firms, such as Standard and Poor or the AM Best Company.

> American Assets has chosen to specialize in the sale of specific products. By doing this, the firm's agents can be "up" on the entire market and offer the clients the very best guidance and advice in purchasing those specific investments. Some of the companies we rep-

resent are Fortune 500 and S & P 500 companies, such as, Conseco, Allianz, American Benefits Services, Inc., and Mutual Benefits. These fine companies are Mega strong and stable.

Plaintiff testified that he relied on all three types of representations.

Plaintiff emphasized that the brochure stated that AAM would perform the essential tasks, such as the selection of the policies. Since the brochure said "our company" throughout and its letterhead contained the name of AAM, Plaintiff asserts that these representations were made by AAM, rather than ABS. However, when questioned at trial as to whether Plaintiff actually believed that AAM would perform all of the duties advertised in the brochure, he stated, "Mr. McGuire held himself out as a representative of whatever entities would have been involved in making this investment happen, and I relied on his representations that he would see to it that those things were accomplished. Whether he did it personally or had somebody else do it really was of no consequence to me." When asked whether he believed that Defendant knew the insurance policies had never existed, Plaintiff said, "I don't know that he actually knew they didn't exist, but he was terribly remiss in not investigating that." Finally, Plaintiff contends that he did not know that he was dealing with ABS. He thought he was dealing only with Defendant and his company.

## II. JURISDICTION AND BURDEN OF PROOF

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. A proceeding to determine dischargeability of a particular debt is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(I).

The Bankruptcy Code is intended to "provide a procedure by which cer-

tain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" [2] The "fresh start" policy embodied in the Bankruptcy Code is intended for the "honest but unfortunate debtor." [3] In furtherance of the "fresh start" policy, "[e]xceptions to discharge are construed narrowly, and the burden of proving that a debt falls within a statutory exception is on the party opposing discharge." [4] In this regard, the "standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." [5]

## III. ELEMENTS OF FALSE REPRESENTATION

■ Section 523(a)(2)(A) [6] provides that a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from a debt-

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debt-

or's or an insider's financial condition[.]

In *Field v. Mans*, the United States Supreme Court held that the operative terms of this section, "false pretenses," "false representation[s]," and "actual fraud," are common law terms that should be given their common law meaning. [7] These terms "incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular state." [8] In defining "actual fraud," the Supreme Court looked to the treatment of "fraudulent misrepresentation" in the Restatement (Second) of Torts ("Restatement"). [9] The Restatement defines "fraudulent misrepresentation" as:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation. [10]

Post-*Field* courts emphasize the importance of reliance on the Restatement in order to better discern the meaning of Section 523(a)(2)(A). [11]

**2.** *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

**3.** *Id.* at 287, 111 S.Ct. 654.

**4.** *Driggs v. Black (In re Black),* 787 F.2d 503, 505 (10th Cir.1986); *First Bank of Colorado Springs v. Mullet (In re Mullet),* 817 F.2d 677, 680 (10th Cir.1987). *See Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 782 (10th Cir. BAP 1998).

**5.** *Grogan v. Garner,* 498 U.S. at 291, 111 S.Ct. 654.

**6.** All references to "Section" shall refer to Title 11, United States Code, unless otherwise noted.

**7.** *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**8.** *Id.* at 71 n. 9, 116 S.Ct. 437. *See also Bellco First Fed. Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1362 (10th Cir.1997).

**9.** *Field v. Mans,* 516 U.S. at 70, 116 S.Ct. 437.

**10.** RESTATEMENT (SECOND) OF TORTS § 525 (1976).

**11.** *In re Kukuk,* 225 B.R. 778, 784 n. 5 (10th Cir. BAP 1998); *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers),* 275 B.R. 606, 619 (Bankr.D.Utah 2002).

Prior to *Field*, in *Fowler Bros. v. Young (In re Young)*,[12] the Tenth Circuit required that a movant prove the following five-point test in order to except a debt from discharge under Section 523(a)(2)(A):

1. The debtor made a false representation;

2. The debtor made the representation with the intent to deceive the creditor;

3. The creditor relied on the representation;

4. The creditor's reliance was reasonable;

5. The debtor's representation caused the creditor to sustain a loss.

*Field* modified this test by holding that the creditor's reliance need only be "justifiable" (subjective test), rather than "reasonable" (objective test).[13] Otherwise the *Young* test does not "differ dramatically from the definition of misrepresentation stated under Restatement § 525."[14] Lower courts within the Tenth Circuit continue to apply the *Young* five-point test (as modified by *Field*) and also refer to the Restatement to guide the application of the elements of Section 523(a)(2)(A) to the facts of a case.[15]

## IV. THE ELEMENT OF SCIENTER

### A. Are There Exceptions That Do Not Require Proof of Scienter?

■ Plaintiff has argued that he is excused from demonstrating the Defendant's intent to deceive ("scienter") because the nature of his claims impose strict liability on Defendant. First, Plaintiff has argued that the three operative terms, "actual fraud," "false representation" and "false pretenses," require the use of three different legal standards.[16] He further argues

---

**12.** 91 F.3d 1367, 1373 (10th Cir.1996).

**13.** Although the *Young* decision bears a date after that of *Field*, it fails to reference the *Field* decision or its modification of the reliance element.

**14.** *In re Kukuk*, 225 B.R. at 784 n. 5.

**15.** *Id.; Daniels v. Clark (In re Clark)*, 2002 WL 1821600 (10th Cir. BAP Aug.9, 2002)(unpublished disposition). *See Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir. BAP 2002); *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *aff'd in part vacated in part by* 2002 WL 1044832 (10th Cir. May 24, 2002); *Nat'l Dev. Servs., Inc. v. Denbleyker (In re Denbleyker)*, 251 B.R. 891, 895 (Bankr.D.Colo.2000); *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606 (Bankr.D.Utah 2002); *Wilder v. Waller (In re Waller)*, 210 B.R. 370, 371–72 (Bankr.D.Colo.1997).

**16.** *Field* involved a claim of "actual fraud." It did not involve the question of whether Section 523(a)(2)(A) requires the application of a single test, or whether each phrase "false pretense," "false representation," and "actual fraud"—requires an independent test. *Field*

*v. Mans*, 516 U.S. 59, 71 n. 8, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). One commentator analyzing this issue has noted that courts sometimes describe different tests for the different terms but that the distinctions are more formal than real. Margaret Howard, *Shifting Risk and Fixing Blame: The Vexing Problem of Credit Card Obligations in Bankruptcy*, 75 AM. BANKR. L.J. 63, 78 (Winter 2001). She further observes that scienter is required regardless of the term at issue and that this may suggest the use of a single test. *Id.* Another commentator analyzed false pretenses and false representations separately from fraud, but nevertheless cited *Field*, an actual fraud case, in discussing the proper standard of reliance for the former. 4 Lawrence P. King, COLLIER ON BANKRUPTCY § 523.08[1][d] (15th ed.2001). Some cases distinguish the three terms. *See, e.g., Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691 (Bankr.N.D.Ill.2002). Others hold that a single test should apply. *See, e.g., La Capitol Fed. Credit Union v. Melancon (In re Melancon)*, 223 B.R. 300, 307 (Bankr.M.D.La. 1998). In *AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir.2001), the court acknowledged that, prior to *Field*, some courts defined Section 523(a)(2)(A)'s three bases differently, but declined to address whether these distinctions

that the term "false representation" operates as a strict liability, *i.e.*, without any requirement of scienter on the part of Defendant or justifiable reliance on the part of Plaintiff. The Restatement provides that an "innocent representation" of a material fact, made in connection with a sale, rental or exchange transaction, may result in strict liability.[17] While the innocent misrepresentation may be sufficient to establish liability to the injured party, it does not state a basis for exception to dischargeability of the debt in bankruptcy. This Court finds no authority that construes "false representation" or the other operative terms of this statute broadly enough to allow an innocent misrepresentation to satisfy the requirements of this Section. In fact, regardless of whether they adopt different definitions or tests for the three operative terms, courts uniformly require proof of the elements of scienter and justifiable reliance in order to establish any of the three possible claims under Section 523(a)(2)(A).

■ Secondly, in his summary judgment briefs and Pretrial Statement, Plaintiff argued that the viatical he purchased is a "security," subject to federal securities laws. Since this security was not registered, Plaintiff argues, Defendant is strictly liable for Plaintiff's loss. Plaintiff then leaps to an assumption that this strict liability automatically establishes non-dischargeability of the debt in bankruptcy. Plaintiff has substantiated a portion of his argument, by quoting from an Order of Chief Judge Babcock of the U.S. District Court for the District of Colorado, which renders a finding that this viatical is a security. Since a copy of the opinion of Judge Babcock was not attached to his brief and Plaintiff has not quoted further language from the opinion, the Court is left with no evidence that Judge Babcock rendered a finding of securities fraud, or otherwise made findings that would demonstrate the state of mind necessary to establish the element of scienter. Furthermore, Plaintiff offers no support for his proposition that any violation of securities law will render the debt non-dischargeable.[18] Section 523 contains seventeen specific grounds for a finding of non-dischargeability, but it does not create a specific exception for violations of securities laws. If Congress wishes to create such an exception, it can do so. This Court will not create a judicial exception.

■ While not articulated by Plaintiff, this Court recognizes that there are circumstances in which the U.S. Supreme Court has been willing to impute fraudulent intent from a guilty party to an innocent party, in a non-dischargeability con-

---

survive *Field.* Courts within the Tenth Circuit have described the operative terms of Section 523(a)(2)(A) differently. *See e.g., Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr.D.Colo.1990) (defining false pretenses), *aff'd in part and rev'd on other grounds,* 146 B.R. 269 (D.Colo.1992). Post-*Field,* courts within the Tenth Circuit appear to apply the *Young* test, the Restatement, or both, to actions under Section 523(a)(2)(A), regardless of the operative term alleged. *See, e.g., In re Kukuk,* 225 B.R. 778, 783–787 (10th Cir. BAP 1998)(analyzing "false representation" and relying on Section 525 of the Restatement). Regardless of the operative term

alleged, the Tenth Circuit requires scienter. *See, e.g., Nixon v. Audley (In re Audley),* 275 B.R. 383, 388 (10th Cir. BAP 2002).

17. RESTATEMENT (SECOND) OF TORTS § 552C (1976).

18. Two Circuit Courts of Appeal have been unwilling to hold a principal guilty for a stockbroker's fraud under Section 20(a) of the Securities Exchange Act of 1934. *Owens v. Miller (In re Miller),* 276 F.3d 424 (8th Cir. 2002); *Hoffend v. Villa (In re Villa),* 261 F.3d 1148 (11th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 2328, 153 L.Ed.2d 159 (2002).

text. In *Strang v. Bradner*,[19] the Supreme Court held an innocent partner liable for a guilty partner's fraud, when the partnership received the fruits of the fraud and the guilty partner had acted within the scope of his authority. Since the debt arose from fraud, and nonbankruptcy law imputed liability from party to another, the court then found the debt non-dischargeable in the bankruptcy of the "innocent" party. In *Strang*, state partnership law imputed liability from the guilty partner to the innocent ones, as long as the guilty party acted within the scope of his authority and the partnership benefitted directly or indirectly from the fraud.[20] In the more recent decision of *Cohen v. de la Cruz*,[21] the Supreme Court held that "[o]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge."[22]

Justice Harlan's opinion in *Strang* appears at first blush to contradict with his earlier opinion in *Neal v. Clark*,[23] which held that " 'fraud' referred to that section [the predecessor of Section 523(a)(2)(A)] means positive fraud, or fraud in fact, involving . . . intentional wrong . . . and not implied fraud, or fraud in law . . . ."[24] How can these two opinions be reconciled? Does Section 523(a)(2)(A) allow vicarious liability for fraud or must a plaintiff establish fraud in fact, as opposed to implied fraud?

One commentator has suggested an interpretation of these two decisions which harmonizes their holdings.[25] Both decisions stand in deference to nonbankruptcy law when determining whether to impose vicarious liability for fraud. Some nonbankruptcy laws, such as the state partnership law implicated in *Strang*, are compensatory in nature and impose vicarious liability on certain parties who may not themselves have been guilty of fraud, but because of their position, the law favors compensation of the victim over the protection of the nonactor. In partnership law, vicarious liability is imposed on partners who vest a partner with authority to act for them, even to the extent of imputing fraud liability.[26] On the other hand, in *Neal v. Clark*,

[t]he debtor's liability . . . by contrast, was not based upon a purely vicarious/compensatory liability regime; applicable nonbankruptcy law imposed liability for the executor's fraudulent misconduct on Neal only upon a showing of some level of misconduct by Neal (gross negligence). Neal's liability, therefore, was at least partially founded upon culpability, and the holding of *Neal v. Clark*, is simply that the only level of culpability that gives rise to a nondischargeable debt is "positive fraud . . . involving . . . intentional wrong."[27]

---

**19.** 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885).

**20.** *Id.* at 561, 5 S.Ct. 1038.

**21.** 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

**22.** *Id.* at 218, 118 S.Ct. 1212.

**23.** 95 U.S. 704, 24 L.Ed. 586 (1877).

**24.** *Id.* at 709.

**25.** *The Dischargeability of "Control Person" Liability for Federal Securities Fraud: Actual Fraud, Vicarious Nondischargeability, and the Vacillating Objects of the 523(a)(2)(A) Discharge Exception*, BANKR. L. LETTER, 2002 WL 1022151 (May 2002) [hereinafter BANKR. L. LETTER].

**26.** *Strang v. Bradner*, 114 U.S. 555, 561, 5 S.Ct. 1038, 29 L.Ed. 248 (1885).

**27.** BANKR. L. LETTER, *supra* note 25, 2002 WL 1022151, at * 8.

In applying general agency law principles to this case, this Court finds no basis for imposing vicarious liability. The Restatement (Second) of Agency imposes vicarious liability on the principal for the torts of an agent under the doctrine of respondeat superior.[28] It does not impose liability for the principal's fraud on an innocent agent.

> An agent is not liable because of misrepresentations of the principal or of another agent unless he knows or should know of them. He is not affected by the knowledge of facts which the principal or another agent has and which, if known to him, would cause his representations to be fraudulent. An agent who makes untrue statements based upon the information given to him by the principal is not liable because of the fact that the principal knew the information to be untrue. An agent can properly rely upon statements of the principal to the same extent as upon statements from any other reputable source.[29]

*Strang* is not limited to a holding that only agency law will support a basis for imposing vicarious liability in a nondischargeability context. Plaintiff, however, has not identified any other nonbankruptcy · law, applicable to this case, that would support a basis for imposing vicarious fraud liability.

### B. How Does a Plaintiff Prove Scienter?

▇▇▇ Having determined that there is no exception to the need to prove scienter

applicable to this case, how does Plaintiff demonstrate Defendant's scienter? The Tenth Circuit has held that the element of scienter, or intent to deceive, in the context of Section 523(a)(2)(A) is present only with "those frauds involving moral turpitude or intentional wrong, and [is not demonstrated by] fraud implied in law which may arise in the absence of bad faith or immorality." [30] How does the Court determine when this required mental state is present? In answering this question, the Tenth Circuit Bankruptcy Appellate Panel has held:

> The fraudulent intent element of § 523(a)(2)(A) ... may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances "presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.[31]

In this regard, "[a] 'line is to be drawn between an intent to mislead and mere negligence. An honest belief, however unreasonable, that the representation is true and the speaker has information to justify it [has been] held ... to be no sufficient basis for deceit.' " [32] "A 'dumb but honest' defendant does not satisfy the test of scienter." [33]

---

**28.** RESTATEMENT (SECOND) OF AGENCY § 219(1) (1976).

**29.** *Id.* § 348 cmt. b.

**30.** *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986).

**31.** *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) (quoting 3

William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2d § 47:16, n. 62 (1999)) (citations omitted), *aff'd in part and vacated in part by* 35 Fed.Appx. 826, 2002 WL 1044832 (10th Cir. May 24, 2002).

**32.** *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. at 778, 788 (10th Cir. BAP 1998)(quoting PROSSER AND KEETON ON TORTS, p. 742 (5th ed.1984)).

Must the plaintiff demonstrate that the debtor knew that his representation was false? The Restatement does not limit the inquiry this narrowly. It sets forth three ways in which the scienter element can be established: (a) when the maker of a misrepresentation "knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." [34] "The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation under the rule stated in this Section, but it is evidence from which his lack of honest belief may be inferred." [35] The second two subsections are akin to willful blindness or reckless disregard. While not all courts agree, the Tenth Circuit has held that a finding of reckless disregard may satisfy the scienter element. [36] A finding of reckless disregard, however, "should be very narrowly interpreted." [37]

Deciding when misrepresentations cross the line from negligence to reckless disregard is an inherently subjective process. It is not a quantitative analysis, whereby twenty errors reflect negligence, but twenty-one errors constitute reckless disregard. The Court must always focus on the totality of the circumstances and whether they create the overall impression of a deceitful debtor.

## V. INSUFFICIENT EVIDENCE OF SCIENTER & ACTUAL RELIANCE

### A. The Investment Representations

With respect to the investment representations respecting the security and liquidity of the investment, the Court finds that Plaintiff himself was a victim of

---

33. *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir.1997).

34. RESTATEMENT (SECOND) OF TORTS § 526 (1976).

35. *Id.* § 526 cmt. d.

36. *Driggs v. Black (In re Black),* 787 F.2d 503, 506 (10th Cir.1986)("requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts") (§ 523(a)(2)(B) context). *See In re Kukuk,* 225 B.R. at 787 (§ 523(a)(2)(A) context); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 301 (2nd Cir.1996) ("There is no doubt that the bankruptcy court applied a proper standard; intent to deceive can be inferred from the totality of circumstances, including reckless disregard.")(§ 523(a)(2)(B) context); *Insurance Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1118–19 (3rd Cir. 1995)("Thus, we join with other courts, including the Courts of Appeals for the Sixth, Tenth, and Eleventh Circuits, in holding that the intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth.")(§ 523(a)(2)(B) context). *But see Am. Title Ins. Co. v. Gramolino (In re Gramolino),* 183 B.R. 565, 568 (Bankr.E.D.Mo.1995) ("The results of the Court's research has not supported the Plaintiff's argument that in the Eight Circuit, the standard of actual knowledge required under Section 523(a)(2)(A) has been diluted by the recognition of a standard that is based on some degree of reckless conduct."). *See also De La Cruz v. Cohen (In re Cohen),* 191 B.R. 599, 605 (D.N.J.1996), *aff'd by* 106 F.3d 52 (3rd Cir.1997), *aff'd by* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (in applying a § 523(a)(2)(B) reckless disregard case to § 523(a)(2)(A), the District Court reasoned that a court's rationale of how scienter and intent may be proved under § 523(a)(2)(B) is applicable in proving intent under § 523(a)(2)(A) as the contexts are closely related and the difficulty in proving subjective intent of the debtor is the same).

37. *In re Kukuk,* 225 B.R. at 787.

the Ponzi scheme perpetrated by ABS and that he not only believed his investment representations to be true, but that there were no "red flags" that would cause him to question the legitimacy of these statements. Defendant's testimony in this regard was both credible and convincing. There was no evidence that he lacked confidence in these statements or that he had no basis for making the statements. In fact, these statements were consistent with his research regarding viaticals generally. There was no evidence that these statements would not have been true if the policies had actually been purchased and he had no reason to believe that the policies had not been purchased. Certificates from ABS not only represented that they existed, but contained detailed information regarding the policies. Although the investment representations were not true, they were not made with either knowledge of their falsity or with reckless disregard for their truth.

## B. The Transaction Representations

■ The transaction representations center mainly on the fact that, in customizing the brochure for AAM's use, Defendant did not replace the term "our Company" with the term "ABS," thus technically representing that AAM would perform all of the tasks that ABS was to perform, such as the selection and purchase of the policies, because the only company identified in the brochure was AAM, in the letterhead. This Court must decide whether Defendant intended to mislead Plaintiff in making the transaction representations, or alternatively, whether Defendant was merely negligent. Defendant testified that he believed that all of the transaction representations would in fact be performed by ABS and that he did not intend to mislead

Plaintiff into thinking that AAM would be responsible for such tasks. Defendant's testimony was persuasive.

The Restatement provides that "[a] representation that is believed to state the truth. but which because of negligent expression states what is false is a negligent but not a fraudulent misrepresentation." [38] This encompasses situations in which a representation is "made misleading by mere carelessness, as when the word 'not' is inadvertently omitted, or by the maker's incompetence to use with accuracy the language in which the representation is expressed." [39] Defendant's failure to change the references to "our company" in connection with the transaction representations was in error, but the error was akin to a typographical error. It was inadvertent, careless, and negligent, but not deceitful. Therefore, this Court finds that Defendant did not possess the requisite scienter with respect to the transaction representations.

■ Alternatively, Plaintiff did not persuade the Court that he actually relied on the careless references to "our company." Plaintiff testified that he believed that the only company he was dealing with was AAM. He contends that he was unaware that the viatical investment was a product of ABS. Plaintiff's testimony was not persuasive. The customized brochure upon which Plaintiff relied identifies AAM as a retail brokerage agency that contracted with insurance and financial service companies. It does not reference or describe any products of AAM's. As Plaintiff observed during his meetings at AAM's office, AAM was a small operation, with very limited staff. Defendant discussed the products of at least four different companies with Plaintiff and disclosed the

---

**38.** RESTATEMENT (SECOND) OF TORTS § 528 (1976).

**39.** *Id.* § 528 cmt. a.

identity of the companies offering the products. Once Plaintiff had decided to invest in a viatical, he considered the different features offered by Mutual Benefit's viatical versus ABS' viatical and ultimately selected the ABS viatical. The sales documents executed by Plaintiff make clear that, as of the execution date, Defendant knew nothing about the specific life insurance policies in which Plaintiff was purchasing a beneficial interest. These documents were part of a booklet identifying the parties to the contract as Plaintiff and ABS, not AAM. Thus, there were numerous indicators that the entity with whom Plaintiff was contracting was ABS, not AAM.

Plaintiff is an attorney and gave the impression that he is a sophisticated investor. This does not mean that he could not justifiably rely on the "our company" statements, but the Court was not convinced that he actually did. Furthermore, there was no evidence that brokers in this industry customarily perform these services or that they would normally double check to insure that the insurance company policy backing a viatical was in existence. Plaintiff introduced no evidence that Defendant ordinarily performed these services for his other customers. The Court concludes that Plaintiff knew that AAM was only a middleman, and not the entity that was actually engaged in the business of locating and acquiring suitable insurance policies for resale. Accordingly, Plaintiff cannot prevail under Section 523(a)(2)(A) based on the transaction representations because he did not actually rely on these representations. He expected that someone would perform these tasks, but the Court finds he did not rely on the brochure's careless reference to "our company" as the provider of these services.

## C. The ABS Representations

 The most problematic statements are the ABS representations and yet there was very little testimony regarding them. Statements that ABS was a Fortune 500 or S & P company, for example, should be easily verifiable. At trial, Plaintiff directly asked Defendant whether ABS was a Fortune 500 or S & P company, and Defendant's response was, "no, I don't think so." Plaintiff then asked Defendant, "why did you represent that it was?" Defendant did not recall making such a representation. When confronted with the statement in the brochure, Defendant responded only that he was not aware that ABS was either a Fortune 500 or S & P company. There was no evidence admitted as to whether these statements were actually false. Assuming that they were in fact false, Plaintiff has raised the question as to whether Defendant had a basis for making these statements. Since Defendant merely copied the brochure's contents from the one he received from SunCoast, it may be that ABS made these representations as to its own status and that formed Defendant's basis for making them. Even if these particular statements in the brochure were recklessly made, because Defendant had no basis for making them, this Court is constrained to look at the totality of the circumstances in this case. There are cases where the overwhelming impression is that the numerous misrepresentations or omissions were not merely coincidental or negligent, but represent a pattern that makes the Court conclude that the debtor was deceitful or that he participated in the deception by intentionally turning a blind eye. This is not such a case. The overall impression of this Court is that the Defendant was negligent or careless, but that he was not a part of the deception.

Alternatively, there was also insufficient evidence that Plaintiff relied on the ABS

**496**

representations. Clearly, Plaintiff had no intent to do business with a company operating a Ponzi scheme, but there was no indication that the references to AAM doing business with Fortune 500 companies, which included ABS among the examples listed, had any influence over Plaintiff's investment decision. In fact, all indications are that Plaintiff was not satisfied with Defendant's investigation of ABS and sought to conduct some due diligence of his own. Plaintiff asked Defendant for references on ABS, and Defendant indicated that he did not have any, but he gave Plaintiff telephone numbers that would allow him to contact the representatives of ABS himself, to satisfy any concerns he had as to ABS. While he testified that he relied on all representations in the brochure, the Court did not find this testimony credible. Whenever Plaintiff recounted the false representations, he never highlighted those regarding ABS' status as a Fortune 500 company or the other ABS representations.

## VI. CONCLUSION

Plaintiff has failed to establish a claim under Section 523(a)(2)(A) because he has not demonstrated the necessary elements of scienter and actual reliance. Accordingly, judgment shall enter in favor of Defendant. It is ORDERED that the debt owed by Defendant to Plaintiff in the amount of $35,000 is dischargeable. A separate Judgment will enter.